(No. 51598.—)

CLIENT FOLLOW-UP COMPANY *et al.*, Appellants, v. THOMAS C. HYNES, County Assessor, *et al.*, Appellees.

*Opinion filed March 14, 1979.—Rehearing denied May 30, 1979.*

Thomas E. Brannigan, of Flanagan, Bilton & Brannigan, of Chicago, for appellants Client Follow-Up Co. *et al.*

Robert S. Cushman, Minard E. Hulse, Jr., and Thomas J. McNulty, of Keck, Mahin & Cate, of Chicago, for

appellant Technical Exhibits Corp.

Bernard Carey, State's Attorney, of Chicago (Mark V. Chester, Assistant State's Attorney, and Paul P. Biebel, Jr., Deputy State's Attorney, of counsel), for appellees Thomas C. Hynes, Stanley T. Kusper, and Edward J. Rosewell.

James P. Chapman and James D. Wascher, of Chapman & Royce, Ltd., of Chicago, for appellee Township High School District 205.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale and Richard F. Friedman, Assistant Corporation Counsel, of counsel), for appellee City of Chicago.

William J. Scott, Attorney General, of Springfield (Paul J. Bargiel and Imelda R. Terrazino, Assistant Attorneys General, of Chicago, of counsel), for appellee Department of Local Government Affairs.

William J. Harte, Ltd., of Chicago (William J. Harte and Kevin M. Forde, of counsel), for appellee Allan Masters, P.C.

MR. JUSTICE RYAN delivered the opinion of the court:

In this case we are confronted with the question of whether section 5(c) of article IX of the Illinois Constitution of 1970 prohibits the imposition of an *ad valorem* tax on personal property after January 1, 1979, and if so, is the further provision of section 5(c) concerning the enactment of a replacement tax operable. Section 5(c) provides:

> "On or before January 1, 1979, the General Assembly by law shall abolish all ad valorem personal property taxes and concurrently therewith and thereafter shall

replace all revenue lost by units of local government and school districts as a result of the abolition of ad valorem personal property taxes subsequent to January 2, 1971. Such revenue shall be replaced by imposing statewide taxes, other than ad valorem taxes on real estate, solely on those classes relieved of the burden of paying ad valorem personal property taxes because of the abolition of such taxes subsequent to January 2, 1971. If any taxes imposed for such replacement purposes are taxes on or measured by income, such replacement taxes shall not be considered for purposes of the limitations of one tax and the ratio of 8 to 5 set forth in Section 3(a) of this Article."

In this case, Client Follow-Up Company, an Illinois corporation (Client), filed a class action in the circuit court of Cook County against Thomas C. Hynes, assessor of Cook County, Stanley T. Kusper, county clerk of Cook County, and Edward J. Rosewell, county treasurer and *ex-officio* county collector of Cook County. Count I of the complaint sought a declaration that the extension and collection of 1978 personal property taxes against the plaintiffs after January 1, 1979, is unconstitutional, and sought to enjoin their extension and collection. Count II sought similar relief as to 1979 personal property taxes. Thereafter, an order was entered allowing Allan Masters, P.C., a professional corporation (Masters), Township High School District 205 of Cook County, and the city of Chicago to intervene as parties defendant. Technical Exhibits Corporation, an Illinois corporation, was granted leave to intervene as a party plaintiff and as a representative of a class of corporations that are being assessed for a "capital stock tax" by the Department of Local Government Affairs (Department), which was made a party defendant.

Motions to dismiss were filed. The court granted the respective motions to dismiss, holding that the provisions of section 5(c) of article IX do not constitute an abolition of the personal property tax after January 1, 1979, but

constitute a mandate to the legislature. Notices of appeal were filed and this court entered an order under Rule 302(b) (58 Ill. 2d R. 302(b)), transferring the appeal from the appellate court to this court.

The defendants, relying on this court's holding in *Elk Grove Engineering Co. v. Korzen* (1973), 55 Ill. 2d 393, contend that the provisions of section 5(c) do not constitute a limitation on the legislative power to impose personal property taxes after January 1, 1979, but, instead, constitute only a mandate to the General Assembly to abolish the personal property tax. The defendants point out that this court has held that a constitutional mandate to the legislature cannot be enforced by the courts, citing *Fiedler v. Eckfeldt* (1929), 335 Ill. 11, *Fergus v. Kinney* (1928), 333 Ill. 437, *Fergus v. Marks* (1926), 321 Ill. 510, *People ex rel. Woodyatt v. Thompson* (1895), 155 Ill. 451, and G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 116 (1969). It is also contended that our holding in *Elk Grove* supports the conclusion that even after January 1, 1979, the adoption of a replacement tax is required before any *ad valorem* personal property tax can be abolished.

In *Elk Grove,* this court considered statutory enactments which had exempted certain classes of personal property from taxation. The General Assembly had not enacted replacement taxes as required by section 5(c). This court stated that the provisions of that section constituted a mandate to the legislature to abolish *ad valorem* taxes on personal property on or before January 1, 1979; that the provision was not self-executing; that the section required the General Assembly, when abolishing the tax, to concurrently therewith and thereafter enact a replacement tax, and that the provision of that section concerning the replacement tax was also not self-executing. This court held that the legislature could not abolish the *ad valorem*

personal property tax on a class of taxpayers without enacting a replacement tax as required by section 5(c) of article IX. This court made no determination in *Elk Grove* as to whether the mandate of the Constitution to the legislature to abolish the tax continued after January 1, 1979, or whether after that date action by the General Assembly would be necessary to abolish the tax. The same is true of our holding in *American National Bank & Trust Co. v. Kusper* (1977), 69 Ill. 2d 374.

Since the issues now before this court were not considered in *Elk Grove* or *American National Bank,* the decisions in those cases are not controlling. We must, therefore, now construe the effect of the provisions of section 5(c) of article IX as they apply to *ad valorem* taxes levied on personal property after January 1, 1979.

Under traditional constitutional theory, the basic sovereign power of the State resides in the legislature. Therefore, there is no need to grant power to the legislature. All that needs to be done is to pass such limitations as are desired on the legislature's otherwise unlimited power. (G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 111 (1969).) Thus, limitations written into the Constitution are restrictions on legislative power and are enforceable by the courts. On the other hand, constitutional directives to the legislature are considered as mandates or commands to the legislature to act, and it is generally held that the courts are powerless to enforce them. (Kamin, *Constitutional Abolition of Ad Valorem Personal Property Taxes: A Looking-Glass Book,* 60 Ill. Bar J. 432 (1972).) Thus, the issue before us is whether section 5(c) of article IX constitutes a limitation on the legislature's authority to tax after January 1, 1979, or whether the continuing mandate to abolish this tax, which *Elk Grove* determined to exist before January 1, 1979, continues to be a mandate to the legislature after that date.

In construing the meaning of a constitutional provision, it is appropriate and helpful to examine it in light of the history and condition of the times, and the particular problem which the convention sought to address by incorporating in the document the questioned provision. (*Wolfson v. Avery* (1955), 6 Ill. 2d 78, 88-93.) When the 1970 Illinois constitutional convention convened, there was strong sentiment in this State to abolish personal property taxes by valuation. (Kamin, *Constitutional Abolition of Ad Valorem Personal Property Taxes: A Looking-Glass Book,* 60 Ill. Bar J. 432, 435 (1972).) Both the report of the Committee on Revenue and Finance, and the report of the dissenters on that committee, recognized the unfairness of the *ad valorem* personal property tax and the inability to apply it evenly. (7 Record of Proceedings, Sixth Illinois Constitutional Convention 2129-42, hereafter referred to as Proceedings.) In fact, a publication entitled "Report of Governor's Revenue Study Committee, 1968-69," incorporated in the report of the majority of the Revenue and Finance Committee, referred to the personal property tax in Illinois as a "scandal." (7 Proceedings 2133.) As discredited as the *ad valorem* personal property tax may have been, it was recognized by the committee that this tax provided a substantial amount of needed revenue for the local taxing bodies, which would be seriously hampered in their operation by the outright abolition of the tax. 7 Proceedings 2131.

The constitutional convention was also aware that the 1969 General Assembly had enacted Senate Joint Resolution No. 30 (1969), which proposed an amendment to the 1870 Constitution which would exempt personal property "as to individuals" from taxation. This proposed amendment was to be submitted to the voters at an election on November 3, 1970. The proposals adopted by the Constitutional Convention would be submitted to the voters about a month later at a special election on December 15,

1970. It was anticipated by the convention that the voters would approve Senate Joint Resolution No. 30 on November 3, 1970, and that at the time of the referendum on the proposals adopted by the constitutional convention, *ad valorem* taxes on personal property owned by individuals would have been abolished.

Against this background of events, the Committee on Revenue and Finance presented its proposal to the convention, the language of which, with only minor changes, ultimately became section 5(a) of article IX of the 1970 Constitution. The committee did not incorporate in its proposal any of the provisions now found in sections 5(b) or 5(c) of article IX. The provisions of these two subsections were adapted from the report of those members of the Committee on Revenue and Finance who dissented from the proposal submitted by the committee.

The explanation to the convention which accompanied the proposal of the committee stated that the approval of its proposal concerning personal property taxes would permit the legislature to nullify the results of the referendum on Senate Joint Resolution No. 30, and to enact legislation providing property tax relief it deemed advisable. 7 Proceedings 2137.

The dissenters from this proposal submitted their version of a proposed personal property tax provision for the Constitution. It provided:

> "Any ad valorem personal property tax abolished or not imposed on the date this article takes effect shall not be reinstated or imposed thereafter. On January 1, 1979, the General Assembly shall abolish all ad valorem personal property taxes not previously abolished, and shall replace revenues lost to local governmental units as a result of such abolition by levying or authorizing the levy of taxes other than on an ad valorem basis." (7 Proceedings 2139.)

The explanation for the proposal of the dissenters stated that the proposed constitution must take note of the effect of the voters' action on Senate Joint Resolution No.

30, and pointed out that if it were to appear to the voters that the new constitution reinstated a tax that they had voted out of existence on November 3, 1970, the entire revenue article would be in jeopardy. The explanation further stated that the first sentence of the proposal was designed to remove any such doubt. The explanation further stated that the last sentence of the proposal directed a 9-year phaseout of the personal property tax to avoid disruption of local government finances and required the legislature to provide replacement revenue. 7 Proceedings 2139.

As noted above, the provision of the proposal of the committee became section 5(a) of article IX. The provision of the first sentence of the dissenters' proposal became section 5(b) of article IX, and the provision of the last sentence of the dissenters' proposal was incorporated in section 5(c) of article IX, with which we are concerned in this case. The history of the development of these sections in the constitutional convention is set out in *Elk Grove*.

There can be no doubt that the dissenters, by their proposal, were attempting to abolish the *ad valorem* personal property tax. In the explanation of their proposal the dissenters stated:

> "The ad valorem personal property tax is the only tax *we place beyond the reach of the General Assembly ***.*" (Emphasis added.) (7 Proceedings 2140.)

Delegate Meek, one of the dissenters, filed an additional explanation in which he stated:

> "There are those who say that this provision usurps the prerogative of the state legislature, that it is a legislative rather than a constitutional issue. This is true, but there is no hope that the General Assembly will ever abolish this tax." (7 Proceedings 2141.)

He then concluded:

> "It is up to this Constitutional Convention to admit that the General Assembly has made no real effort to

eliminate the system, to mandate the General Assembly to find new means of raising revenue, and to blot out for present and future generations a tax which is the very essence of inequity and corruption in Illinois." (7 Proceedings 2141.)

Considering the provision of section 5(c) of article IX in light of the history and conditions of the times, and considering the end sought to be accomplished by those dissenters who submitted to the convention the proposals that were ultimately incorporated in section 5(c), it is apparent that the end sought to be accomplished, at least by those who made the proposal, was the abolition of the *ad valorem* personal property tax.

The intent to be derived from the debates on the floor of the convention as to whether section 5(c) of article IX constitutes a limitation or a mandate after January 1, 1979, as to abolishing the tax is less clear. The report of the Committee on Style, Drafting and Submission, in attempting to incorporate what it thought was the sense of the convention as expressed in the debates, rephrased the dissenters' proposals to state in the first sentence: "No ad valorem tax on personal property shall be levied after December 31, 1978." (7 Proceedings 2235.) This revision was a clear prohibition or limitation and not a mandate to the legislature. When this revised provision was debated, Delegate Cooper objected to the change in language, pointing out that he did not understand the original proposal as abolishing the tax. Delegate Mullen also objected but primarily directed her objection to the suddenness of the abolition, pointing out that the revision would not provide for a phasing out of the tax. She also stated, however, that she agreed with Delegate Cooper, but in answer to a question by Delegate Leahy, stated:

"We hope that the General Assembly will take steps in the next eight or nine years to get rid of some of the elements of personal property taxes, but if they don't or what ones are left *we want to be abolished.*" (Emphasis

added.) (5 Proceedings 3761.)

Delegate Cooper stated that if the General Assembly did not act, he understood the tax would remain in effect. Delegate Mullen then again stated that she "would think the General Assembly should take *** action." She later stated, however:

> "I intended it to be chopped off, but these are local government taxes, and it seems to me somewhere the General Assembly would have to say something." (5 Proceedings 3761.)

No vote was taken to determine the sentiment of the convention, and the chairman of the Style, Drafting and Submission Committee suggested that the original language be reinstated. When this section was presented by that committee on third reading, the chairman raised the question of whether the first sentence of section 5(c) of article IX automatically abolished the personal property tax subsequent to January 1, 1979, and, if the personal property tax is not abolished by January 1, 1979, whether the replacement requirement is valid thereafter. (5 Proceedings 4255.) These two questions were not addressed or responded to by the convention.

When the meaning of provisions of the Constitution are in doubt, it is appropriate to consult the debates of the delegates to the constitutional convention to ascertain the meaning which they intended to give to those provisions. (*Wolfson v. Avery* (1955), 6 Ill. 2d 78, 88; *People ex rel. Keenan v. McGuane* (1958), 13 Ill. 2d 520.) In our case the debates reflect that a few of the delegates understood the doubtful language to constitute a mandate to the General Assembly. Others, although in doubt as to the meaning of the provisions, thought the legislature should "say something." However, less than 10 out of the 116 delegates expressed themselves in debate concerning the meaning of the language used in section 5(c) of article IX. When the matter was debated on the question of the

language incorporated by the Committee on Style, Drafting and Submission on second reading, no vote was taken which would have revealed the sense of the convention. As against this, the six members of the Committee on Revenue and Finance who dissented from the report of that committee, and who proposed the provision which was adopted as an amendment to the report of that committee and which was later incorporated in section 5(c) of article IX, clearly indicated that it was their intention to abolish the *ad valorem* tax on personal property. The Committee on Style, Drafting and Submission thought it had incorporated the sentiment of the delegates when it drafted the version objected to on second reading by Delegate Cooper, which version contained a specific prohibition on the tax after January 1, 1979. It is possible to lift from the constitutional debates on almost any provision statements by a delegate or a few delegates which will support a particular proposition; however, such a discussion by a few does not establish the intent or understanding of the convention. The debates on the issue with which we are now concerned are inconclusive insofar as disclosing any understanding by the delegates as to the meaning of section 5(c) of article IX. It has been suggested that this was possibly intentional. Delegate Whalen, who was chairman of the Committee on Style, Drafting and Submission, stated subsequent to the adoption of the 1970 Constitution:

> "Anticipation of judicial review provided the delegates with the opportunity to draft intentionally ambiguous provisions for inclusion in the constitution. The delegates envisioned that these ambiguities would be ultimately resolved by the courts. In some cases delegates even expected a specific interpretation by the courts which was politically impossible to obtain in the Constitutional Convention for want of majority agreement on the substantive issue.
>
> For example, the convention was closely divided on

the question of whether the ad volorem personal property tax should be abolished by the constitution. The proponents of abolition introduced a successful amendment which stated: 'On or before January 1, 1979, the General Assembly by law shall abolish all ad valorem personal property taxes. ***'

The intent of some of the proponents was clear. The ad valorem personal property tax would be unconstitutional and therefore uncollectable after 1979 no matter what the General Assembly did. The opponents of abolition, on the other hand, contended that the amendment was simply a mandate to the General Assembly and that without legislative action the ad valorem personal property tax could continue to be imposed. Rather than face the issue squarely and provide any definite language as to whether or not the tax would be abolished, the convention approved an ambiguous amendment which will probably be interpreted in the courts. Thus, the courts, not the convention, must resolve the political question." Whalen & Wolff, *Constitutional Law: The Prudence of Judicial Restraint Under the New Illinois Constitution,* 22 De Paul L. Rev. 63, 65-66 (1972).

Although the constitutional debates may often be helpful in understanding the meaning of doubtful constitutional provisions, the true inquiry concerns the understanding of its provisions by the voters who, by their vote, have given life to the product of the convention. *People ex rel. Keenan v. McGuane* (1958), 13 Ill. 2d 520, 527; *Wolfson v. Avery* (1955), 6 Ill. 2d 78, 88; *Burke v. Snively* (1904), 208 Ill. 328, 344.

In 1969 the General Assembly adopted Public Act 76–40, calling the constitutional convention which drafted the 1970 Constitution. Section 13 of that same act required that the constitutional revision adopted by the convention be submitted to the electors for ratification or rejection. Section 13 also provided:

"Each proposed revision, alteration, or amendment, together with appropriate information explaining each revision, alteration, or amendment, shall be published in

full and disseminated to the electors \*\*\*." (1 Proceedings 835, 839.)

A special committee, which came to be known as the "Section 13 Committee," was appointed by the president of the convention to perform the requirements of section 13 of the enabling act (Pub. Act 76—40), including presenting information to the voters concerning the proposed revision. The committee was composed of the officers of the convention and 10 delegates. (1 Proceedings 235.) On August 30, 1970, the chairman of the Section 13 Committee filed that committee's report, which contained an explanation for each section of the proposed constitution. The report was distributed on that date to each delegate. (5 Proceedings 4440.) It does not appear that the report was debated or voted on by the delegates prior to the adjournment of the convention on September 3, 1970. However, on September 2, 1970, the Section 13 Committee presented a resolution to the convention which would authorize the committee to make stylistic and grammatical changes in the explanation which had been circulated to the delegates, and where substantive changes might be involved to make the same, with the majority vote of the committee and the majority of the officers approving. The resolution was adopted on September 2. (5 Proceedings 4660.) The explanation of certain parts of section 5(c) of article IX ultimately given to the voters contained some stylistic changes from the language in the report of the committee circulated to the delegates. However, as to that part of section 5(c) of article IX with which we are now concerned, the explanation given to the voters was the same as that contained in the committee's report which had been given to the delegates on August 30. Both documents stated: "It [section 5(c) of article IX] *prohibits taxing any personal property by its value after January 1, 1979.*" (Emphasis added.) 7 Proceedings 2737.

There was also a committee on the "Address to the

People" which filed its report on September 2, 1970. (1 Proceedings 769; 5 Proceedings 4638.) It was understood that the traditional role of an "Address to the People" was to justify and explain proposed changes in the constitution. It was anticipated by this committee that the address would probably be published as an introduction to the published text of the constitution and the explanation that would be distributed to the people of Illinois. The report of this committee was debated on that date, and certain changes were made; however, no changes or debate concerned the constitutional provision now under consideration. (5 Proceedings 4638-60.) The report of the committee was adopted and ultimately was included as a part of the official publication which was disseminated to the public, which included the address, a sample ballot, and the proposed constitution with the explanations as to each section. The address to the People, in discussing the personal property tax, stated that *ad valorem* taxes on personal property of individuals are made dependent on the result of the referendum on November 3, 1970. "Any remaining personal property tax is to be abolished by 1979 \*\*\*." (7 Proceedings 2676.) It thus appears that through these two official publications the voters were informed that if they adopted the new constitution, after January 1979 there would be no *ad valorem* tax on personal property.

In addition to the official information disseminated to the voters, other unofficial information to the same effect was given wide circulation. Although the unofficial publications lack any official status in that they did not emanate from the convention or authorized personnel, they nonetheless constitute a part of the total body of information available to the public, by which the voters were informed as to the meaning of the various sections of the constitution. As such, these unofficial publications are worthy of consideration in ascertaining the understanding

of the voters as to the meaning of this doubtful section when they cast their ballots in favor of the revised constitution. In *Wolfson v. Avery* (1955), 6 Ill. 2d 78, 89-92, this court, in attempting to ascertain the understanding of the voters concerning a provision in the 1870 Constitution, considered the interpretations which had been given to that section by several newspapers throughout the State prior to the referendum. In this regard, it is worthy to note that on December 10, 1970 (the referendum on the 1970 Constitution was held December 15, 1970), the Chicago Tribune quoted Governor Oglivie of this State as saying:

> "The Revenue Article also would 'deal the final death blow to the last vestiges of the personal property tax *** .' "

On Sunday, December 13, 1970, the Chicago Tribune devoted substantial space to discussing and explaining the various sections of the proposed constitution. John Elmer, a correspondent for that paper who covered the convention, stated in an article:

> "Other major revenue sections include: *** a bar on personal property tax on corporations after 1978 ***."

That same issue of the Chicago Tribune contained an article by Samuel Witwer, who had been president of the constitutional convention. He spoke in favor of the adoption of the new constitution, and his article included the following:

> "The new constitution will end all *** personal property taxation by the end of 1979 [*sic*]."

In addition to this statement by Witwer, John Karns, who had served as chairman of the Committee on Revenue and Finance at the convention, in summarizing the provisions of the revenue article of the new constitution, stated in another publication:

> "Only local governments tax real or personal property, but the Convention revamped the property tax

system. It *abolished the ad valorem personal property tax as of January 1, 1979."* (Emphasis added.) 32 Weekly Illinois Constitutional Convention Summary 14 (for week ending September 3, 1970).

Thus, we have Witwer, who was president of the constitutional convention, and Karns, who was chairman of the Committee on Revenue and Finance, both speaking publicly before the referendum stating their views to be that the new constitution would prohibit *ad valorem* taxes on personal property after January 1, 1979. Both of these gentlemen played substantial roles in framing this constitution. Delegate Karns, as chairman of the Committee on Revenue and Finance, would be especially knowledgeable concerning the revenue article. It was very much within their power to express to the voters reliable opinions as to the intent of those who framed the constitution. Because of their positions, their expressions as to the meaning of this section would carry great weight with the voters and should be helpful to this court. (See *Wolfson v. Avery* (1955), 6 Ill. 2d 78, 89; *Cohens v. Virginia* (1821), 19 U.S. (6 Wheat.) 264, 416-18, 5 L. Ed. 257, 294.) We find that the address to the People, the official explanation, the statements contained in the Chicago Tribune, and the statements of Delegates Witwer and Karns all reflect that the logical understanding of the voters as to the meaning of section 5(c) of article IX would be that after January 1, 1979, no legislative action was required to abolish *ad valorem* taxes on personal property; that after that date the Constitution prohibited such taxes. Thus, we hold that the language of section 5(c) of article IX does not constitute a continuing mandate to the legislature to abolish *ad valorem* taxes on personal property after January 1, 1979, which would be unenforceable by the courts. We hold, instead, that the language of section 5(c) of article IX constitutes a limitation on the power to tax after that date.

We hold, however, that this interpretation does not affect 1978 personal property taxes collectable in 1979. The plaintiffs cite several cases from other jurisdictions and contend that since the mechanics of extending and collecting personal property taxes for 1978 had not been completed, and the tax was not due as of January 1, 1979, the tax cannot now be collected. Each jurisdiction has its own statutory taxation scheme, schedules and practices. In interpreting our own scheme of taxation it is not necessary that we analyze in detail the schemes and practices in other jurisdictions and abide by the constructions placed upon those statutory schemes by the courts in our sister States. In Illinois, the owner of personal property on April 1 is liable for taxes on that property for that year. (Ill. Rev. Stat. 1977, ch. 120, par. 508a.) The statutory assessment procedure calls for personal property to be listed for assessment purposes between April 1 and June 1 of each year. (Ill. Rev. Stat. 1977, ch. 120, pars. 528, 529.) During the calendar year various taxing bodies adopt their budgets and levy ordinances and file them with the county clerks. Our scheme of taxation also contemplates that the collectors' books be delivered to the collectors on or before December 31 of the taxable year and that the collectors shall then proceed to collect the taxes. (Ill. Rev. Stat. 1977, ch. 120, pars. 653, 671.) Delays in the extension of taxes, however, often require this time to be extended. The personal property tax becomes a lien upon the personal property of the person assessed from and after the date that the tax books are received by the collector. (Ill. Rev. Stat. 1977, ch. 120, par. 698.) The word "year" when used in the Revenue Act of 1939, with references to taxes for a year, means a calendar year, beginning with the first day of January. (Ill. Rev. Stat. 1977, ch. 120, par. 482(22).) Also, it is provided in another statute that "taxable year" means the calendar year during which *ad valorem* property taxes payable in

the next succeeding year were levied. (Ill. Rev. Stat. 1977, ch. 67½, par. 403.13.) Under our scheme of taxation the taxes for the year 1978 had accrued prior to January 1, 1979.

The constitutional debates never directly discussed whether the abolition of the tax would retroactively prohibit the collection of the tax for the previous year. However, the explanation to the voters and other material previously discussed can reasonably be interpreted as stating that it is the personal property tax for the year 1979 and subsequent years that is prohibited. At the time the 1978 tax liability accrued, at the time that liability attached for the tax, and at the time the local governmental bodies adopted their tax-levy ordinances, there was no prohibition of *ad valorem* personal property taxes other than as to individuals. We therefore conclude that the 1978 personal property tax payable in 1979 is collectable.

Intervenor Masters contends that after January 1, 1979, the replacement requirement of section 5(c) of article IX is no longer effective. We do not agree. The delegates to the convention expressed great concern about the effect of the loss of revenue to units of local government through the abolition of the personal property tax and felt that the legislature *must* enact replacement legislation (*Elk Grove Engineering Co. v. Korzen* (1973), 55 Ill. 2d 393, 404). In *Elk Grove,* this court noted (55 Ill. 2d 393, 402-03) that the chairman of the Committee on Style, Drafting and Submission raised the question of whether the replacement requirement of section 5(c) of article IX would apply if the General Assembly did not act to abolish the tax by January 1979. There was no response to his question. There appears to be nothing in the constitutional debates, the explanation to the voters, the address to the People, or the language of section 5(c) itself that requires the adoption of Masters' contention. When this section of the constitution was being debated, it was

generally considered by the delegates that *ad valorem* personal property tax as to individuals would be abolished by the referendum that would be held on November 30, 1970, and that the net effect of section 5(c) of article IX would be the abolition of *ad valorem* taxes on personal property owned primarily by corporations. The delegates were concerned that this class of taxpayers would thus be relieved of the tax burden which the General Assembly could then shift to some other class of taxpayers. It was stated that this section would be a continuing responsibility of the General Assembly to enact replacement legislation. To make this meaning clear during the debates, an amendment was adopted which inserted the words "and thereafter" so that the language would read:

"and shall concurrently therewith and thereafter replace all revenue lost ***." (5 Proceedings 3825-39.)

If Masters' contention were adopted and the replacement mandate of section 5(c) of article IX were rendered ineffective, the General Assembly would be able to accomplish the very end that the delegates did not want; that is, the shifting of the burden of the abolished tax to another class of taxpayers. Not only is that end contrary to the expressed intent of the delegates, but it is also contrary to the language of the address to the People, which stated:

"Any remaining personal property tax is to be abolished by 1979, and the loss of revenue to local governments is to be replaced by a statewide tax, imposed on the class or classes relieved ***." (7 Proceedings 2676.)

Likewise, the explanation to the voters indicated that when the tax is abolished, the General Assembly must replace the revenue lost by local governments by placing a statewide tax on those who were relieved of the personal property tax. (7 Proceedings 2737.) We therefore hold that the mandate to the General Assembly to enact a replacement tax under section 5(c) of article IX continues after

the tax was abolished on January 1, 1979. Although, as noted earlier in this opinion, such a mandate is not generally judicially enforceable, it does, nonetheless, constitute a constitutional command to the General Assembly to act, and the members of that body have by their oath sworn to support the Constitution of the State of Illinois (Ill. Const. 1970, art. XIII, sec. 3).

We therefore conclude that section 5(c) of article IX prohibits the levy, extension or collection of *ad valorem* personal property taxes for the calendar year 1979 and thereafter. We hold that the *ad valorem* personal property taxes for the year 1978, collectable in 1979, have not been abolished and are collectable. We hold that the provision of section 5(c) of article IX concerning the enactment by the General Assembly of a replacement tax constitutes a continuing mandate to that body to comply with the requirements of that section. Accordingly, the judgment of the circuit court of Cook County is reversed and the cause is remanded to that court for further proceedings.

*Reversed and remanded.*