LAKE COUNTY BOARD OF REVIEW, Plaintiff-Appellee, v. PROPERTY TAX APPEAL BOARD OF THE STATE OF ILLINOIS *et al.*, Defendants-Appellants and Cross-Appellees (The Town of Warren *et al.*, Intervening Plaintiffs-Appellees and Cross-Appellants).

Second District    No. 84—0624

Opinion filed February 5, 1986.

Neil F. Hartigan, Attorney General, of Springfield (Bonnie J. Bona, Assistant Attorney General, of Chicago, of counsel), for appellant Property Tax Appeal Board of the State of Illinois.

Arvey, Hodes, Costello & Burman, of Chicago, for appellant Marriott Corporation.

Fred L. Foreman, State's Attorney, of Waukegan (James C. Baak, Assistant State's Attorney, of counsel), for appellee Lake County Board of Review.

Jerome N. Robbins and Robert A. Kohn, both of Robbins, Schwartz, Nicholas, Lifton & Taylor, of Chicago, for other appellees.

JUSTICE SCHNAKE delivered the opinion of the court:

This appeal concerns the real estate taxes for 1981 on property which comprises Marriott's Great America theme park in Gurnee. The Warren Township assessor originally determined that the real estate had a fair market value of $66,971,862 as of January 1, 1981, which resulted in an equalized assessed value of $22,301,630. Marriott Corporation (Marriott), the owner of the property, complained of the assessment to the Lake County Board of Review (LCBR) which, however, ordered no change in the assessment. Marriott then appealed to the Property Tax Appeal Board (PTAB), which conducted a *de novo* evidentiary hearing on the matter. Following that hearing, but prior to the PTAB's decision, numerous local tax levying units filed a petition to intervene in the proceedings. The PTAB denied that request and subsequently issued its decision which determined that the fair market value of the real estate was $44 million.

The LCBR filed an action for administrative review of the PTAB's decision in the circuit court of Lake County. The taxing districts were granted leave to intervene in that proceeding. The circuit court found that the PTAB had erred in calculating the percentage of the fair market value of the theme park which was attributable to personal property by failing to bind Marriott to certain of its personal property tax returns. The decision of the PTAB was upheld in all other respects, and the matter was remanded for a new assessment. On remand the PTAB, using a different figure for the percentage of fair market value attributable to personal property, determined that the fair market value of the real estate was $50 million. The circuit court then entered a final judgment order, affirming the decision of the PTAB on remand, and ordering a refund to the taxpayer in the amount of $380,064.24 with interest from the date of the order. The order also denied a request by the taxing districts for a "tax deficiency levy" to help them recoup revenues lost because of the refund. One of the taxing districts, the board of education of Warren Township High School District No. 121, has paid its share of the refund to Marriott. With respect to the other taxing districts, the circuit court's order was stayed pending appeal.

Marriott and the PTAB appeal the final judgment order. They contend that the PTAB's original calculation of the percentage of fair market value attributable to personal property was proper, and that the circuit court erred in setting a different figure and ordering a new assessment. The taxing districts cross-appeal. They contend that the PTAB erred by denying their petition to intervene, and that its findings on certain issues were against the manifest weight of the evi-

dence. They argue that the circuit court erred by failing to order a "tax deficiency levy." The taxing districts contend also that the circuit court's final judgment order should be reversed under "the doctrine of Confession of Error." A review of the evidence presented to the PTAB is necessary for a proper resolution of these issues.

Marriott presented to the PTAB a rather lengthy appraisal of the real estate as of January 1, 1981, prepared by Price Associates, Inc. According to the appraisal, Marriott's Great America is a theme park constructed on approximately 312 acres of land. The park opened in May of 1976. The development consists of amusement park rides, game arcades, theaters, restaurants, retail facilities, and service-related structures such as maintenance sheds. At the time of the appraisal the park was divided into five different theme areas named Home Town Square, County Fair, Yukon Territory, Yankee Harbor, and Orlean's Place. The rides, restaurants, retail facilities, theaters, and game arcades in each section were associated with that section's theme. For example, the Yukon Territory included a ride called Loggers' Run and a retail facility called the Moosejaw Trading Company.

The appraisal used three different approaches to determine the fair market value of the real estate: the cost approach, the income approach, and the comparative market data approach. Under the cost approach, the appraisers first determined the value of the land exclusive of improvements. This determination was made by consideration of sales of other large sites in Lake County with commercial influence, as well as of prices asked by owners and offers made by prospective purchasers. A summary of four of the most comparable transactions taken into consideration was set forth, in which the price per acre varied from $12,604 to $15,120. The appraiser concluded that $13,000 per acre, or a total of approximately $4,060,000 was the fair market value of the land involved here. The cost of the improvements was determined by estimating their replacement cost and deducting accrued depreciation. The appraisers did not include the rides as realty improvements, although they did include their "foundations and support facilities that are permanently affixed to the land." Replacement costs were determined by taking the actual cost and applying a multiplier to reflect increased construction costs. The appraisers determined that the improvements should be depreciated a total of 50%, 20% for physical deterioration and 30% for economic obsolescence. The economic obsolescence was caused by such factors as the depressed economy in the Chicago area as of the tax date, the limited operating season of the park because of its northern location and climate, and the demands of the public for new and different attrac-

tions. The fair market value for the realty improvements calculated in this manner was $42,767,410. Addition of the land value resulted in an estimate of fair market value of the real estate of approximately $46,825,000.

Under the income approach the appraisers stabilized revenues and expenses, other than real estate taxes, based on the actual operating history of the park. Consideration was also given to the current health of the theme park industry and the prospects for growth. This process resulted in a net operating income estimate of $14,013,000. The appraisers then calculated the percentage of income attributable to personal property and deducted that amount from the net operating income estimate. The percentage of income attributable to personal property was calculated by comparing the actual cost of the personal property adjusted for inflation with the sum of the actual cost of the realty improvements adjusted for inflation and the value of the unimproved land. This calculation resulted in a figure of 25% for the amount of income attributable to personal property. The appraisal stated that consultation with industry analysts indicated that investment in personal property normally ranged from 25% to 40% of the total investment in a theme park. Deducting the 25% of the net operating income estimate attributable to personal property resulted in an estimate of the net operating income attributable to real property of $10,509,750. This income was then capitalized at a rate of 24.4%, which included a 12% "safe rate," a 10% capital recovery rate which reflected the risk associated with the venture and provided for a return of investment, and a 2.4% real estate tax load factor. The resulting estimate of the fair market value of the real estate using the income method was approximately $43,075,000.

Under the comparative market data approach, sales of other theme parks were considered. The appraisal indicated that there were only about 20 theme parks of size and quality comparable to Great America, these being primarily operated by six market participants. This resulted in a very inactive market, although occasional sales had occurred. Each sale considered was analyzed to determine the net operating income multipliers, *i.e.*, that number which, when multiplied by the net operating income of the theme park, resulted in the purchase price. The sales considered resulted in net operating income multipliers of 2.16, 3.25, 5.07 and 5.35. The appraisers estimated that 4.0 was an appropriate figure for Great America. This multiplier was applied to the net operating income estimate set forth above less estimated real estate taxes, resulting in an estimate of the fair market value of the entire development of $50,208,600. That figure was re-

duced by 25%, representing the value of personal property, for an estimate of the fair market value of the real estate of approximately $37,655,000.

The three estimates described above were correlated by the appraisers, resulting in an estimate of the fair market value of the real estate of $44 million.

At the hearing before the PTAB Mariott introduced its 1976, 1977, and 1978 *ad valorem* personal property tax returns which had been accepted by the Warren Township Assessor. The *ad valorem* personal property tax was abolished in 1979. (See *Client Follow-Up Co. v. Hynes* (1979), 75 Ill. 2d 208, 390 N.E.2d 847.) On the 1976 return, under the heading "Machinery and Equipment," Marriott listed "Rides, etc." at a value of $6,795,320. The total value of all personal property was listed at $7,698,755. Rides were also included in the 1977 and 1978 personal property tax returns.

Marriott called Alfred Taylor, director of park services, as a witness. He testified that in 1977, the second year the park was open, two rides were removed and five new ones were added. In 1978 two new rides were added. In 1980 two new rides were added. In 1981 one new ride was added to the park. Taylor stated that at the time of the hearing three rides were being removed, and one was being relocated to a different area of the park to make room for two additional rides which Marriott planned to install in 1983 and 1984. Taylor stated that the rides in the park were all easily detachable and easily dismantled. Ninety percent of the rides were bolted to a foundation, but some "flat" rides simply rested on the ground.

Taylor testified that there was a very active market for resale of rides throughout the theme park industry. Marriott had sold the rides it removed in 1977 and planned to sell the three it was removing at the time of the hearing. Taylor indicated that none of the rides were designed as a permanent improvement for the park. He explained that repeat visitation was critical for the business, and that Marriott found it necessary to add and change attractions to draw repeat customers. Finally, Taylor testified that no particular ride was essential to the operation of the park, but that rides, in general, were indispensable.

Marriott also called Howard Zimmerman and Calvin Denison, the authors of the appraisal, who testified in support of their conclusions. During cross-examination of Zimmerman, counsel for the LCBR pointed out that in the calculations of the percent of income attributable to personal property, the appraisal listed the original cost of personal property placed in the park from 1974 through 1976 as

$17,936,355. He then asked Zimmerman if he could reconcile that figure with the lower figures reported as the value of the personal property on Marriott's *ad valorem* personal property tax returns, and Zimmerman replied that such a reconciliation was not in the purview of his assignment.

Marriott also called Bruce Brenner, who had previously appraised the Old Chicago theme park in Bolingbrook for the Illinois Central Gulf Railroad. He had also previously appraised property in the area of Great America. Brenner testified that he had reviewed the appraisal prepared by Zimmerman and Denison and had visited the park. He gave his opinion that the value of $13,000 per acre assigned to the land in the appraisal was a "generous valuation" for "that size of a parcel of land at that particular point in time." He testified that the theme park industry was a high risk business, that the 24.4% capitalization rate was "a conservative number," and that he probably would have used something higher than that. Finally, he stated that in his opinion the value of $44 million assigned to the real estate by the appraisal was a well supported and reasonable valuation of the property.

The LCBR called as its only witness Gordon Washburn, the Warren Township assessor. He testified in support of his opinion that the fair market value of the real estate was approximately $67 million. He arrived at this figure by using the cost approach. In 1976 he assessed the real estate with the help of an engineer and came up with a value. He met with representatives of Marriott to determine that they were in the "same ballpark." In each of the succeeding years, he toured the park with a representative of Marriott. Each year he adjusted the value of the previous year and added the value of the additional improvements and subtracted the value of the improvements that had been removed. Washburn testified that he determined the value of additional improvements "mostly with Marriott's figures."

Washburn testified that, using Marriott's figures, he would have estimated that the percentage of the value of the park attributable to personal property was 12% to 15%. He said that he did not think he "discounted all of the rides" as personal property. He stated that by taking the value of personal property reported on Marriott's 1978 tax return and updating it for inflation, he would have estimated the value of personal property in 1981 as $10.4 million.

On cross-examination this colloquy occurred:

"Q. Do you in fact have any appraisal or any data worked up explaining your cost approach to value that you utilized for 1981?

A. No, not on everything."

He was asked whether the correct percentage of value attributable to personal property might be somewhere between 15% and 25%, and he replied, "Yes, it could be. I have not made a study." Finally, in regard to the income approach used in Marriott's appraisal, he testified that he would estimate the capitalization rate to be 22%.

Washburn's testimony concluded the evidentiary hearing. The PTAB then set a briefing schedule for the parties. On the same day that Marriott mailed its brief to the PTAB, the tax levying units mailed their petition to intervene. Accompanying the petition was an appraisal of the real estate prepared by Neil J. King. As noted above, the PTAB denied the petition to intervene and subsequently determined that the fair market value of the real estate was $44 million.

We have previously noted that on administrative review the circuit court held that the PTAB erred in calculating the percentage of the fair market value of the theme park attributable to personal property, but the court upheld the decision in all other respects. The court's finding of error was based on the fact that Marriott's appraisal, in calculating that percentage, used as the cost of personal property placed in the park from 1974 to 1976 the figure of $17,936,355, whereas Marriott's tax return for 1976 listed the value of the personal property at $7,698,755. The court held that Marriott was bound by the figure listed on its tax return. The court recalculated the percentage by comparing that figure to the sum of the original cost of the real estate improvements and personal property and the value of the land as set forth in Marriott's appraisal. As noted above, on remand the PTAB determined that the fair market value of the real estate was $50 million. The circuit court then affirmed that decision and ordered a refund as set forth above.

We first consider the argument of Marriott and the PTAB that the latter's original calculation of the percentage of fair market value attributable to personal property was correct, and that the circuit court erred in calculating a different figure and remanding the cause. We agree with this contention.

The circuit court, in reaching its decision, relied on *People ex rel. Johnson v. Atkinson* (1882), 103 Ill. 45, and *People ex rel. Smith v. National Plate Glass Co.* (1931), 344 Ill. 340, 176 N.E. 319. In this court, the LCBR and the taxing districts rely on those cases to support the circuit court's decision. Those cases did hold that a taxpayer is bound by his *ad valorem* personal property tax return, but they did so in the context of challenges by the taxpayers to personal property taxes extended on the basis of the return involved. Neither case held

that if a taxpayer erroneously valued his personal property in his tax return one year, that he was required to perpetuate the error in subsequent years. Here, Mariott paid the taxes extended on the basis of its 1976, 1977, and 1978 personal property tax returns. In this proceeding it is not disputing the personal property tax for those years. It is disputing its real estate tax for 1981. We do not believe that the principle of *Atkinson* and *National Plate Glass Co.* should be extended to this situation. A contrary conclusion would yield inequitable results. An erroneous personal property tax return from one year could be used by government officials to require over-assessments of real estate for years to come thereafter. The principle that a taxpayer is bound by his personal property tax returns should be limited to challenges to personal property taxes extended on the basis of the returns involved.

Moreover, even if we were to extend the rule of *Atkinson* and *National Plate Glass Co.* as requested by the LCBR and the taxing districts, the result we reach would be the same. Marriott's tax returns reported the *value* of the personal property in 1976, whereas the appraisal, in its calculation of the percentage of fair market value attributable to personal property, used the *cost* of the personal property placed in the park from 1974 to 1976. Value and historical cost are different concepts. Even if, in the proceedings relating to 1981 real estate taxes, Marriott were bound by the value of its personal property in the park in 1976 as reported on its prior tax return, Marriott could litigate the issue of historical cost. We conclude, therefore, that the circuit court erred in its determination that the PTAB had erroneously calculated the percentage of the fair market value attributable to personalty by failing to bind Marriott to its tax returns.

■■ ■ We next consider the argument of the taxing districts that the PTAB erred by denying their petition to intervene. The taxing districts rely primarily on Rule No. 6 of the Official Rules of the PTAB. These rules were adopted under the authority of section 111.2 of the Revenue Act of 1939, which requires the PTAB to "establish by rules an informal procedure for the determination of the correct assessment of property which is the subject of an appeal." (Ill. Rev. Stat. 1983, ch. 120, par. 592.2.) Rule No. 6 provided, in pertinent part:

> "At any time prior to the actual consideration of the appeal by the Board [the PTAB], any interested taxing body may become an intervening party by filing in triplicate with the Clerk of the Property Tax Appeal Board a Request to Intervene."

In denying the petition to intervene filed by the taxing districts, the

PTAB construed the term "actual consideration" in the above rule to mean "actual hearing." Since the petition to intervene was filed after the hearing, the PTAB denied it as untimely. The taxing districts take a different position on the meaning of Rule No. 6. They argue that the term "actual consideration" refers to the deliberative process the PTAB engages in after the filing of the transcript of the hearing and all of the briefs of the parties. Since the petition to intervene was filed before all of the briefs were submitted, the taxing districts maintain that it was timely filed and, therefore, should have been granted.

A reviewing court should accord substantial discretion to administrative agencies in the construction and application of their rules, interfering only if the interpretation is plainly erroneous or inconsistent with long-settled constructions. (*Phillips v. Hall* (1983), 113 Ill. App. 3d 409, 447 N.E.2d 418.) The taxing districts do not argue that the PTAB's interpretation of Rule No. 6 here is inconsistent with prior constructions, and we must, therefore, decide whether it is plainly erroneous. We conclude that it is not.

Hearings before the PTAB, like the one in the instant case, often involve conflicting evidence. Questions regarding the weight of the evidence and the credibility of witnesses may become important, and resolution of these questions may depend on the demeanor of the witnesses as they testify. For these reasons, we believe that the PTAB was justified in deciding that "consideration of the appeal" begins at the hearing. We are aware that the hearing in the instant case was conducted by a hearing officer, but we do not believe that fact requires a different conclusion. Under Rule No. 5 of the Official Rules of the PTAB, the Board may require the hearing officer to submit a report of his findings in appropriate cases.

■ The taxing districts also cite section 2—408 of the Code of Civil Procedure which, in relevant part, provides:

> "(a) Upon timely application anyone shall be permitted as of right to intervene in an action: *** (2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or judgment in the action; ***." (Ill. Rev. Stat. 1983, ch. 110, par. 2—408.)

This statute is not applicable to proceedings before the PTAB. Section 1—108 of the Code provides, in relevant part:

> "(a) The provisions of Article II of this Act [including section 2—408] apply to all proceedings covered by Articles III through XIX of this Act except as otherwise provided in each of the Articles III through XIX, respectively.

(b) In proceedings in which the procedure is regulated by statutes other than those contained in this Act, such other statutes control to the extent to which they regulate procedure but Article II of this Act applies to matters of procedure not regulated by such other statutes." (Ill. Rev. Stat. 1983, ch. 110, par. 1—108.)

Proceedings before the PTAB are not covered by any of the articles in the Code. The procedure relating to intervention in proceedings before the PTAB is regulated by Rule No. 6 quoted above, and we have decided that the PTAB properly construed that rule with reference to this case.

It is true, as the taxing districts point out, that section 2—408 was applicable to the proceedings for administrative review in the circuit court. Article III of the Code covers administrative review. The taxing districts, however, were allowed to intervene in those proceedings. Their claim of error is based on the denial of the petition to intervene before the PTAB. The case of *Will County Board of Review v. Property Tax Appeal Board* (1971), 48 Ill. 2d 513, 272 N.E.2d 32, cited by the taxing districts, is similarly inapplicable. In that case our supreme court simply held that the taxing districts were properly permitted to intervene in the administrative review action in the circuit court.

██ Here the PTAB sent the Lake County State's Attorney notice of the place, date, and time of day of the hearing. Section 111.3 of the Revenue Act of 1939 provides that "[n]otice to all interested taxing bodied shall be deemed to have been given when served upon the State's Attorney of the county from which the appeal has been taken." (Ill. Rev. Stat. 1983, ch. 120, par. 592.3.) The taxing districts did not have a constitutional right to notice of the proceedings. (*Will County Board of Review v. Property Tax Appeal Board* (1971), 48 Ill. 2d 513, 272 N.E.2d 32.) The taxing districts did not seek to intervene until after the evidentiary hearing had been held, and Marriott had prepared its brief based on the evidence presented. In connection with their petition to intervene, the taxing districts sought to present an appraisal of the property by Neil J. King. Under these circumstances, we believe that the PTAB properly denied, under Rule No. 6, the taxing districts' petition to intervene.[1]

---

[1]We note that after this case was concluded in the circuit court, an amendment to section 111.2 became effective which requires the PTAB to serve a copy of the petition on the taxing districts where a change in assessed valuation of $100,000 or more is sought. Ill. Rev. Stat., 1984 Supp., ch. 120, par. 592.2

■ We next consider the argument of the taxing districts that certain findings of the PTAB are contrary to the manifest weight of the evidence. Findings of an administrative agency on questions of fact are, of course, *prima facie* correct, and they may be set aside only if they are against the manifest weight of the evidence. (*People ex rel. Thompson v. Property Tax Appeal Board* (1974), 22 Ill. App. 3d 316, 317 N.E.2d 121, *appeal dismissed, cert. denied* (1975), 422 U.S. 1002, 45 L. Ed. 2d 666, 95 S. Ct. 2623.) We have previously noted that under the cost approach, Marriott's appraisal determined fair market value by adding the value of the land to the replacement cost of the real estate improvements less accrued depreciation. The taxing districts argue that the PTAB should not have accepted the opinion of Marriott's appraisers that accrued depreciation amounted to 50% of the replacement cost, 20% for physical deterioration, and 30% for economic obsolescence. They maintain that 50% was too high in light of the fact that the buildings were only one to five years old, and the appraisers stated that they were in "good physical condition." We cannot conclude that the PTAB's conclusion in this respect was against the manifest weight of the evidence. The appraisers stated that although the improvements were in "good physical condition," the vast majority of them "represent low quality or substandard construction" so that they "experienced physical depreciation at a higher annual rate than would be expected for typical construction." As we previously noted, the appraiser explained his reasons for assigning a figure of 30% to economic obsolescence. A 50% depreciation under the circumstances is not inherently improbable, and no other evidence on this question of fact was presented to the PTAB.

The taxing districts also maintain that the PTAB erred by accepting the opinion of Marriott's appraisers that the value of the land, exclusive of improvements, was $13,000 per acre. The taxing districts base this contention on the fact that Marriott's land was zoned industrial commercial and was serviced by public utilities, and that one of the comparable sales used by the appraisers, involving land with utilities available that was to be developed into an industrial park, was at a price of $15,000 per acre. They also note that the value assigned to Marriott's land was closer to the sales prices in the comparable sales involving land zoned for agricultural use. Again, we cannot conclude that the PTAB's finding in this regard was against the manifest weight of the evidence. Howard Zimmerman testified that the comparable sale involving the sale price of $15,000 per acre was of a tract of land in Lincolnshire, and that land values in that area were substantially higher than land values in Gurnee. Marriott presented three

expert witnesses who approved of the $13,000 value. Their testimony was not inherently improbable, and it provided a sufficient basis for the PTAB's finding.

The taxing districts also maintain that the PTAB erred in accepting the 24.4% capitalization rate used by Marriott's appraisers in the income approach to fair market value. They argue that the rate was "unjustifiably high" because Marriott "enjoys a monopoly." We disagree. The appraisal, in its overview of the theme park industry, listed several recent business failures. Bruce Brenner, who had appraised the Old Chicago theme park in Bolingbrook, testified that the theme park industry was a high risk business. In light of this testimony, we cannot conclude that the 24.4% capitalization rate was against the manifest weight of the evidence. In regard to the capitalization rate, the taxing districts also argue that the tax load factor should have been 2.18% rather than 2.4%. This matter was brought up at the hearing, and the testimony of Howard Zimmerman indicated that use of the 2.18% tax load factor, rather than 2.4%, would not have had a significant effect on his ultimate conclusion.

▪▪ The final complaint of the taxing districts with regard to the PTAB's findings concerns its approval of an "entrepreneurial profit" expense used by Marriott's appraisers in their calculation of stabilized income for purposes of the income approach. The appraisal defined this expense as "a return to the entrepreneurial skills and creativity which are an absolute necessity for survival in the theme park industry." The taxing districts maintain that it was improper to recognize this expense when the capitalization rate included a risk factor. The appraisal stated that recognition of this expense was "[i]n accordance with accepted valuation procedure." Absolutely no expert testimony to the contrary was presented. We, therefore, cannot conclude that the PTAB's approval of this expense was contrary to the manifest weight of the evidence.

▪▪ We next consider the argument of the taxing districts that the circuit court erred by denying their request for a "tax deficiency levy." The taxing districts maintain that they did not levy taxes in 1981 at the maximum rate allowed by law because, based on the assessment of the real estate in their jurisdictions, their financial needs were met by a lower rate. Great America provides a substantial portion of the aggregate assessed valuation of the taxing districts. They maintain that if they had known the assessment of Great America would be reduced, they would have levied taxes at the maximum rate to meet their budgetary requirements. Finally, they contend that the trial court should have ordered a supplementary levy, a "tax defi-

ciency levy," so that they could recoup the lost revenue. Presumably, the supplementary tax would have to be paid by the owners of the real estate in the taxing districts as of 1981. In our judgment, the trial court properly refused to order the requested "tax deficiency levy."

The levy, assessment, and collection of taxes are purely statutory and can be made only as expressly provided by statute. (*People ex rel. Shirk v. Glass* (1956), 9 Ill. 2d 302, 137 N.E.2d 265.) Section 194 of the Revenue Act of 1939 provides that, to the extent that the taxes withheld by the collector from the taxing districts as a protest fund are insufficient to pay the refunds ordered of taxes paid under protest, "the refunds of principal and interest shall be paid out of the first funds collected for such taxing district[s] in the following taxable year." (Ill. Rev. Stat. 1983, ch. 120, par. 675.) No provision is made for a supplementary levy. Section 162, cited by the taxing districts, concerns the determination of tax rates and does not authorize tax deficiency levies. (Ill. Rev. Stat. 1983, ch. 120, par. 643.) In *People ex rel. Skidmore v. Anderson* (1974), 56 Ill. 2d 334, 307 N.E.2d 391, the taxing districts argued that it would be inequitable to order a refund of taxes payable out of their current revenue. They maintained that they might have to default on financial obligations, and that such a default would impair their future borrowing ability. Our supreme court responded as follows:

> "Although we are sympathetic with the intervenors [taxing districts] because of the problem which may arise from the ordering of refunds, it is not possible to distinguish between the intervenors and other taxing bodied which have been ordered in other cases to make refunds. 'We are aware of the impact of an adverse holding on the interested taxing bodies but, as readily recognized by *amici curiae*, our decision cannot be based upon their financial needs.' *People ex rel. Korzen v. Chicago, Burlington & Quincy R.R. Co.*, 32 Ill. 2d 554, 564." 56 Ill. 2d 334, 341.

■■ We finally consider the argument of the taxing districts that the final judgment order of the circuit court should be reversed under "the doctrine of Confession of Error." In our judgment, this "doctrine" is not helpful to the resolution of this appeal. Although both Marriott and the taxing districts have requested us to reverse the final judgment order, the parties disagree regarding the directions to be given to the circuit court on remand. Accordingly, we have addressed the merits of the case.

For the reasons stated above, the judgment of the circuit court of

Lake County is reversed, and this cause is remanded to that court with directions that it reinstate the initial decision of the PTAB, which determined the fair market value of the real estate to be $44 million, and order such further relief, consistent with this opinion, as is appropriate in the circumstances.

Reversed and remanded with directions.

NASH, P.J., and LINDBERG, J., concur.