2017 IL App (1st) 151998

FOURTH DIVISION
June 29, 2017

Nos. 1-15-1998, 1-15-1999, and 1-15-2000, Consolidated

| | |
|---|---|
| WEST LOOP ASSOCIATES, LLC, | ) |
| | ) Direct Review |
| Petitioner, | ) from the Illinois Property |
| | ) Tax Appeal Board |
| v. | ) |
| | ) 09-32895.001-003-C-3 |
| THE PROPERTY TAX APPEAL BOARD, THE CITY OF | ) 10-34445.001-003-C-3 |
| CHICAGO, and THE CHICAGO BOARD OF EDUCATION, | ) 11-29146.001-003-C-3 |
| | ) |
| Respondents. | ) |

**OPINION**

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Ellis and Justice Burke concurred in the judgment and opinion.

¶ 1    Petitioner West Loop Associates, Inc. (West Loop), seeks review of three final administrative decisions by respondent Property Tax Appeal Board (PTAB) to increase the valuation of commercial property located at 550 West Jackson Boulevard in Chicago from $70.4 million to $73.8 million, rather than reducing it as West Loop sought to $58.0 million. West Loop's separate actions with PTAB for the tax years 2009, 2010, and 2011 were consolidated into a single administrative hearing, and the three subsequent appeals to this court, Nos. 1-15-1998, 1-15-1999, and 1-15-2000 have also been consolidated. We have jurisdiction over this direct appeal from PTAB due to section 16-195 of the Property Tax Code (35 ILCS 200/16-195 (West 2014)) because West Loop petitioned for at least a $300,000 change in the assessed valuation of its property. West Loop argues PTAB (1) abused its discretion by granting a motion *in limine* to bar opposition to certain facts in the opinion of the City of Chicago's property valuation expert, Kathleen M. Dart, of KMD Valuation Group, Inc.; (2) applied the wrong

1-15-1998, 1-15-1999, 1-15-2000, cons.

valuation methodology in rejecting the joint opinion of West Loop's valuation experts, Arthur J. Murphy and Timothy R. O'Keefe of Urban Real Estate Research, Inc.; and (3) rendered a decision contrary to the manifest weight of the evidence either by erroneously disregarding the Murphy valuation or by insufficiently analyzing the evidence. West Loop argues for a reversal of PTAB's decision and remand so the agency can properly evaluate the evidence. The respondents are PTAB and intervenors below, City of Chicago (City) and Chicago Board of Education (CBOE or education board).

¶ 2      West Loop purchased the subject property in 2005 for either $125 million or $135 million (both values appear in the record on review). The property is comprised of three adjacent parcels totaling 26,369 square feet which are recorded under Cook County property identification numbers 17-16-113-002, -003, and -009. The rectangular site is zoned "DX-16: Downtown Mixed-Used District" and is located in the West Loop submarket of Chicago's Central Business District. It sits at the northwest corner of the intersection of West Jackson Boulevard and South Clinton Street, across from Union Station. To its west is a large building that fronts onto West Jackson Boulevard and is bordered by South Jefferson Street, and to the north is West Quincy Street. The land is improved with an 18-story, multi-tenant office building, the upper floors of which contain 406,041 square feet of rentable office space and the lower floors of which contain mechanical equipment and a public parking garage with 148 spaces. The building was constructed with a steel frame, metal, green-tinted curtain wall glass, and some stone on the first level. Most of the structure was built in 2001, although it was erected on an existing foundation and incorporated a four-story communications room needed by then-tenant MCI World Com (Verizon).

1-15-1998, 1-15-1999, 1-15-2000, cons.

¶ 3    For tax years 2009, 2010, and 2011, the Cook County assessor initially determined that the value of the 550 West Jackson property was $96.1 million. West Loop appealed to the Cook County board of review, which, after considering the evidence and facts submitted, reduced the assessed value to $70.4 million. West Loop then sought further review by PTAB. West Loop based its tax assessment challenge to PTAB primarily on Murphy's $58 million valuation which was retrospective to January 1, 2009. According to its "Statement of Policy," PTAB "shall determine the correct assessment *** of any parcel of real property which is the subject of an appeal, based upon facts, evidence, exhibits and briefs submitted to or elicited by [PTAB]" (86 Ill. Adm. Code 1910.10(b) (1997)) and "revise the assessment of any particular parcel of real property when it finds such assessment to be in error" (86 Ill. Adm. Code 1910.10(d) (1997)). PTAB granted requests from the City and CBOE for leave to intervene in order to protect their interests in the property tax receipts.

¶ 4    The education board retained an expert to critique the Murphy report consistent with the Uniform Standard of Professional Appraisal Practice and the City retained an expert to perform an independent valuation. The municipality's expert, Dart, came to the conclusion that the retrospective market value of the property as of January 1, 2009, was $73.8 million. Dart noted in her written appraisal rendered on June 13, 2012, that she had been hindered in completing her report. She attached a copy of a letter she sent to West Loop's counsel asking to schedule a site visit accompanied by a property manager and/or building owner and to receive copies of written records such as leases, rent rolls, and annual operating statements. Dart had specified in her letter, "Please contact the undersigned to schedule a date for the building visit. Due to time constraints, we are requesting your response by April 27, 2012. Upon review of all information provided, we may need to request additional documents. Please feel free to contact me or [my

1-15-1998, 1-15-1999, 1-15-2000, cons.

client in the City of Chicago Law Department, Senior Counsel Richard Danaher]." Dart submitted a mail delivery receipt indicating her letter had been received by West Loop's counsel on April 11, 2012. Dart's report indicated that she performed her valuation work between May 22, 2012, and June 1, 2012, based in part on "exterior and very limited interior observations of the subject property" and by extracting information about the building and its site, such as income, expense and lease figures, from the Murphy appraisal and from other materials filed by West Loop's counsel. Dart "reserve[d] the right to revise [her] report if necessary, if a property visit is granted and subject data, including subject leases, detailed operating statements, occupancy reports, and property reports are provided."

¶ 5    In late January 2015, PTAB notified the parties that the matter would proceed to hearing on March 25, 2015. On Friday, March 20, 2015, the City filed the motion *in limine* which is now at issue in West Loop's appeal. The City contended that West Loop's failure to respond to Dart's letter was equivalent to affirmatively denying her request and cited section 1910.94 of title 86 of the Illinois Administrative Code, which addresses the consequences of denying a request to "physically inspect and examine the property for valuation purposes." 86 Ill. Adm. Code 1910.94(a) (2006). Tracking the language of paragraph (a) of section 1910.94, the City argued PTAB should bar West Loop from presenting "any testimony, objection, motion, appraisal critique or other evidentiary material [such as cross-examination of the City's valuation expert witness] that is offered to refute, discredit, or disprove [the City's] evidence *** regarding the description, physical characteristics or condition of the subject property." The City also cited section 1910.79 of title 86 of the Illinois Administrative Code for the proposition that West Loop's conduct contravened PTAB's general policy that all relevant information be disclosed prior to hearing. 86 Ill. Adm. Code 1910.79 (2006). That section states:

1-15-1998, 1-15-1999, 1-15-2000, cons.

"Policy on Discovery

a) It is the policy of the Property Tax Appeal Board to obtain full disclosure of all relevant and material facts prior to hearing.

b) It is the policy of the Board to encourage voluntary exchange by the parties of all relevant and material facts prior to hearing through the use of requests for documents and information. When less formal procedures have proven to be unsuccessful, formal discovery by means available under this Part will be allowed." 86 Ill. Adm. Code 1910.79 (2006).

Three days later, on Monday, March 23, 2015, West Loop filed a written response in which it argued the motion *in limine* should be denied because West Loop had not been properly served with the motion, had not actually denied access to Dart, and had not been contacted by the City's attorney with reasonable attempts to resolve the issue. Paragraph (b) of section 1910.94 states, "Any motion made to invoke this Section shall incorporate a statement detailing the consultation and failed reasonable attempts to resolve differences over issues involving inspection with the taxpayer or property owner." 86 Ill. Adm. Code 1910.94(b) (2006). The following day, Tuesday, March 24, 2015, West Loop sought a continuance of up to 30 days to allow Dart to visit its property. PTAB, however, denied a continuance at the "11th hour" and indicated it would rule on the motion *in limine* at the hearing because the parties and the agency had already begun preparations. When the proceedings commenced on Wednesday, March 25, 2015, PTAB characterized West Loop's failure to answer Dart's inspection request as "a negative, a response of no," PTAB granted the City's motion, and PTAB said it would consider objections if they arose during the hearing.

1-15-1998, 1-15-1999, 1-15-2000, cons.

¶ 6    Before summarizing the hearing testimony, we briefly note the following parameters. Pursuant to Illinois law, real property is to be "valued at its fair cash value, estimated at the price it would bring at a fair voluntary sale." (Internal quotation marks omitted.) *Chrysler Corp. v. Illinois Property Tax Appeal Board*, 69 Ill. App. 3d 207, 211, 387 N.E.2d 351, 355 (1979). Stated in other terms, fair cash value is fair market value. *Chrysler Corp.*, 69 Ill. App. 3d at 211, 387 N.E.2d at 355.

¶ 7    Three basic valuation methods may be used to estimate a property's fair market value. *Chrysler Corp.*, 69 Ill. App. 3d at 211, 387 N.E.2d at 355. These three methods are the sales comparison approach, the income approach, and the replacement cost approach. *Chrysler Corp.*, 69 Ill. App. 3d at 211, 387 N.E.2d at 355. No one of these methods is conclusive, but each is a factor to be considered in valuing a property. *Cook County Board of Review v. Property Tax Appeal Board*, 384 Ill. App. 3d 472, 480, 894 N.E.2d 400, 407 (2008) (*Omni*). "Professional appraisals generally employ more than one method to determine valuation; the use of more than one method in a single appraisal serves as a check on the value reached by the other method or methods." *Omni*, 384 Ill. App. 3d at 480, 894 N.E.2d at 408. Theoretically, the three approaches will lead to the same value or will at least allow the professional appraiser to "weigh any disparate results in order to reach a determination that best reflects the total true value of the property." (Internal quotation marks omitted.) *Omni*, 384 Ill. App. 3d at 480, 894 N.E.2d at 408.

¶ 8    When market value is not conclusively established by a contemporaneous, voluntary, and arm's length sale of the actual property, then the preferred method of determining value is through the sales comparison approach, based on sales of comparable properties on the open market. *Omni*, 384 Ill. App. 3d at 480-82, 894 N.E.2d at 408. The record also includes materials written by the Cook County assessor's office which outline the three established methodologies.

1-15-1998, 1-15-1999, 1-15-2000, cons.

According to the assessor's office, (1) the sales comparison approach compares the subject property to similar properties that have recently sold and have similar characteristics or indicators of value; (2) sales prices may be adjusted due to differences in location, physical characteristics, time of sale, physical condition, size, age, and other market related conditions; and (3) when similar unsold properties are included in the calculations, "[e]xtensive editing and adjustments are made."

¶ 9     The income approach is based on rental income generated by the property and is considered by the assessor's office to be "a very important indicator of property value." The assessor's office uses "market estimates for income, expenses, and a rate of return for an investor (the capitalization rate)" in its calculations to determine value.

¶ 10    Heavy reliance on the third methodology, the reproduction approach, is generally frowned upon. *Chrysler Corp.*, 69 Ill. App. 3d at 211, 387 N.E.2d at 355. According to the information prepared by the assessor's office, the reproduction cost approach is derived by determining the cost to construct the building, less the estimated depreciation of the property. Also, "[g]enerally, the reproduction cost approach should be emphasized only in the context of some special-purpose property, which is defined as property of such a nature and applied to such a special use that it cannot have a market value."

¶ 11    The party appealing an assessment to PTAB bears the burden of producing "substantive, documentary evidence or legal argument sufficient to challenge the correctness of the assessment." (Internal quotation marks omitted.) *Omni*, 384 Ill. App. 3d at 484, 894 N.E.2d at 411; 86 Ill. Adm. Code 1910.63 (2000) (PTAB does not presume the county board of review or local assessing officer to be correct, however, the contesting party has the burden of going

1-15-1998, 1-15-1999, 1-15-2000, cons.

forward with "substantive, documentary evidence or legal argument sufficient to challenge the correctness of the assessment of the subject property" or face the dismissal of the appeal).

¶ 12   West Loop's first witness was Timothy W. Casey, an employee of Jones Lang LaSalle and the manager of the 550 West Jackson building. Casey classified the building as a B or B-property, due to its location west of the river and because designing and constructing around one tenant's existing telephone room had "greatly limited the things they were able to do" and resulted in a lobby that was "much too small." Casey deemed the building to be "primarily back office" rather than "high-end executive-level" space. The vast majority of tenants, meaning 70-to-80%, were financial services or trading firms who liked the building's redundant, independent feeds from separate electric substations. However, trading firms "tend to be very volatile" and "occasionally come and go." The 14th floor had been occupied by a trading firm which went bankrupt in 2009 and moved out, then another trading firm leased the space for 10 years but was gone within 2 years, and a third trading firm was currently occupying the space when Casey testified in 2015. With each tenant turnover, West Loop paid broker commissions, spent money on "tenant improvements" to customize the space, and sometimes gave "free rent." Casey said these were "below-the-line," "non-operating" expenses attributable to acquiring tenants and they could not be recovered directly. Casey indicated this below-the-line accounting practice was approved by the "BOMA [(Business Owners and Managers Association)] committee" for real estate taxation. In tax years 2009, 2010, and 2011, West Loop had an annual statement loss of income to expenses of about "$3 to $4 million."

¶ 13   On cross-examination, Casey said the small lobby does not "fit the classification for a decent BOMA building downtown," but he conceded that the limitation existed when West Loop bought the property in 2005 for $135 million. He denied that the redundant power sources "give

1-15-1998, 1-15-1999, 1-15-2000, cons.

this property a leg up in obtaining financial services tenants." The 14th floor is 16,508 square feet, out of the building's total of 406,041 feet. He was unaware whether the building's website included a building classification, said he had not looked at the website "in a while" because tenants did not use it, and would not be surprised if the website described the building as a Class A property. He acknowledged that Chicago's West Loop office submarket is "the best" and that the property is located across the street from a prime commuter station, several blocks away from other commuter rail stations, and three blocks from the Kennedy Expressway; and that there is public parking in the building as well as within a block or two.

¶ 14    The next witness, Murphy, testified that his qualifications as an appraiser included a bachelor's degree, two master's degrees, courses in real estate valuation, Illinois licensing as a general real estate appraiser, and "MAI" designation with the Appraisal Institute. In addition, Murphy had eight years experience as a commercial valuations deputy assessor in the Cook County assessor's office and 19 years in private practice performing appraisals around the United States, which focused on real estate tax appraisals. Murphy did not inspect the property himself before submitting the appraisal report. He relied on the inspection and preliminary appraisal developed by another appraiser in his office, O'Keefe, and had subsequently inspected the property in preparation for the hearing. Murphy considered the building to be "Class B" based on the "smaller" than normal lobby, some "functional obsolescence," and that the property was "built sort of as back office space in downtown Chicago." It is situated "outside of the downtown really quality office space" or Class A properties that were generating $50 gross income per square foot, and this was reflected in its "gross rent [of] around 35 bucks." However, "[I]t's a quality building. There's no doubt about it. It's a good building."

1-15-1998, 1-15-1999, 1-15-2000, cons.

¶ 15    Murphy's testimony and written report indicated that he used a concept called "investment value," which he believed is "higher than market value," and is created "when investors gather in a bullish market" and have motivations other than "the pure value of the real estate," such as wanting to "build up their portfolio." The owner of 550 West Jackson is a "guy [who] owns buildings here and in New York" and is "building up a portfolio." The investment value concept or "real estate value" approach is "relatively new" and not everyone in the appraisal field would agree with it. However, appraisal work is "an argumentative field." Murphy placed "minimal weight" on the building's sale price of $125 million in October 2005, which he attributed to "faulty expectations" that the building had a "bright future." At the time, there were long term tenants and real estate and financial services tenants who were experiencing a "boom." After the sale, a "major tenant" that was occupying 125,000 square feet, Refco, went bankrupt and vacated the property, and eight of the current tenants were brought in only by abating their rent for 3 to 14.5 months, abating some of their operating expenses and taxes, granting "substantial" tenant improvements, and making capital expenditures. West Loop tried to refinance but was turned down by several lenders, some of whom indicated the property was worth less than $60 million.

¶ 16    Murphy testified about a letter addendum attached to his written valuation which indicated it was "difficult" to value the property in light of a "severe global financial crisis" which was depressing sales volume, sale prices, and rental rates; causing loans to be cost prohibitive; and leading to increasing vacancy rates and "excessive" rent concessions. Sales prices between 2004 and 2008 were not reliable indicators for the current market and until there was sufficient "empirical data," "discounting for the market is somewhat subjective."

1-15-1998, 1-15-1999, 1-15-2000, cons.

¶ 17 Murphy's appraisal also discussed the three methodologies of property valuation. However, when asked whether his appraisal used three approaches to value, Murphy answered "yes and no" and said the replacement cost approach was the "the yes and no one." Murphy did not consider the replacement cost approach to be important in determining the value of the subject building and said the methodology was actually "very suspect in buildings like this" which are neither new nor special purpose properties. Murphy began his cost valuation by determining the land was worth $275 per square foot or $7.250 million, based on five comparable sales ranging from $272.38 to $503.14 per square foot. He then calculated it would cost $96.8 million to replace the building, to which he added 3% for indirect construction costs and 7% for "entrepreneurial incentive," resulting in a total of $106.71 million. After deducting 20% for depreciation and 32.5% for "external obsolescence," and adding $10,000 for the building's parking improvements, Murphy concluded the cost value was $58 million. He explained that he used the calculations from his income approach in his cost approach, in order to conclude that external obsolescence had occurred:

"So the real value you see here is a value based on the income approach.

So that's why I'm saying I did and I didn't. I'm showing it, I'm doing it, but then the depreciation I used is based on the income approach ***."

¶ 18 Utilizing an income approach, which Murphy considered to be the most appropriate methodology for determining the market value of an office building such as 550 West Jackson, Murphy valued this property at $58 million. According to his report, Murphy first determined the property's gross income, subtracted certain expenses to derive net operating income, and then derived and applied a capitalization, or CAP, rate to reach a final value of the property's income-producing capacity.

- 11 -

1-15-1998, 1-15-1999, 1-15-2000, cons.

¶ 19    In order to estimate income and expenses, Murphy had considered rent and expense data from the subject property, seven undisclosed but comparable rental properties, and figures compiled by BOMA for all downtown Chicago buildings with net rentable area of 300,000-to-600,000 square feet. Murphy testified that he did not identify the comparison properties by address in his report because those property owners were clients to whom he had fiduciary responsibilities. Murphy did not consider it necessary to identify the comparable properties in his report because he could disclose that information during the hearing if asked and because the report was "for experts" who "really understand these buildings" and "know whether or not I'm telling the truth." He estimated the gross income of 550 West Jackson by first estimating a market rent of $35 per square foot, adding garage and miscellaneous income of $14,520,478, applying a 10% vacancy rate based on market conditions, and concluding the gross income was $13,068,430. He estimated the property's total operating expenses were $3,729,908, or $9.19 per rental square foot, even though the property's square foot operating expenses ranged between $7.41 and $8.12 between 2007 and 2009, and even though the BOMA figures ranged between $8.23 and $8.29. He increased the operating expenses by $1,217,913—which PTAB now indicates is about $3 per rentable square foot—for advertising and leasing commissions, tenant improvements, and replacement reserves. Murphy admitted that these three expenses are usually considered "below-the-line" expenses rather than operating expenses and that the property's net income would be higher if these three items were not categorized as operating expenses. Murphy determined that the property's net operating income was $8,120,609.

¶ 20    In order to derive an overall CAP rate, Murphy could have used the market extraction method which is considered the "least subjective" because it relies on income and sales data for comparable properties. Although Murphy had identified comparable properties, he did not use

- 12 -

1-15-1998, 1-15-1999, 1-15-2000, cons.

the market extraction method because the comparable figures he extracted did not include a deduction for replacement reserves (Murphy had included replacement reserves in his operating expense calculations for the subject property). Murphy applied the "band of investment" method, which involves determining a mortgage constant and an equity dividend. Murphy arrived at a CAP rate of 9.75%. He then performed a tax load analysis, for an overall CAP rate of 14%, which led him to value the property at $58 million. Murphy's tax load analysis, however, was missing from the appraisal report that he submitted to PTAB.[1]

¶ 21    Murphy reached the similar figure of $57.85 million under a sales comparison approach. He reached this number by first identifying 15 comparable sales primarily in 2007 and 2008, ranging from $149.99 to $401.78 per rentable square foot. Murphy testified that the sales data included "investment value" and had to be adjusted downward accordingly. He said he adjusted the comparable sales data to address this, but he did not disclose the adjustments in his written appraisal nor did he explain what "areas or pertinent factors" were adjusted in his calculations. He also testified that he did not actually make the adjustments, but rather the "the assessor and/or the Board of Review" had and that he "kn[e]w that the assessor did adjust them all, all of them dramatically downward." Murphy also testified, "Since I didn't do those adjustments, I know they're there, but I say in this appraisal I know that these properties have investment value."

¶ 22    When asked for clarification by the administrative law judge as to whether and how Murphy adjusted the sales comparables, Murphy answered that he did not adjust each sale individually, as that "would be too subjective or too difficult" but was "just saying *** here are

_____

[1]Some copies of the Murphy report differed from other copies. The copy sent to PTAB for the tax year 2009 appeal and tax year 2011 appeal omitted 11 pages that contained calculations for the 4.25% tax used in Murphy's loaded CAP rate. The 11 pages did appear in the version submitted for the 2010 tax year appeal. The administrative law judge determined that what had been submitted to PTAB would be the official record.

1-15-1998, 1-15-1999, 1-15-2000, cons.

the sales." Seeking further clarification, the administrative law judge asked Murphy if he was saying that the comparable sales "quantitatively *** should be adjusted downward because in doing the income approach" for the subject property he had arrived at a lower value. Murphy agreed that his income approach valuation justified reducing the comparable sales valuation. Murphy then repeatedly emphasized that his sales comparison conclusions were based on his income approach. For instance, when asked, "What was your conclusion of [real estate] value via the sales comparison approach?," Murphy answered, "I just really honestly want to say it is about the same, and we state here the way we got to this value is via the income approach." Also, "What numbers did you use, the sale price or the number the assessor used?," was answered with, "No, I used the income approach." In addition when asked, "Mr. Murphy, could you explain why you made adjustments [to comparable sales] in the manner that you did?," Murphy said, "I'll try to say clearly that we made the adjustments based on our income approach." Murphy's written sales comparison analysis concluded with the statements: (1) "Our conclusion of value even in this sales comparison section is driven by our Income Approach analysis" and (2) "Taking into consideration our Income Approach, our analysis of the sale of the comparable properties has [been adjusted to $142.50, then multiplied by the rentable square area, for a total price of] $57,850,000."

¶ 23    When reconciling the three valuation methods in order to reach a final valuation figure, Murphy said he "really got [his] answer" through the income approach.

¶ 24    As Murphy testified, it became apparent that there were errors in his written report. For instance, his testimony about the sales comparison approach revealed that 11 pages were missing from the copy that was submitted to PTAB for the tax year 2009 and the copy that was submitted to PTAB for the tax year 2011. Also, although he repeatedly testified that he relied

1-15-1998, 1-15-1999, 1-15-2000, cons.

overwhelmingly on the income approach in valuing 550 West Jackson, his written report stated, "[t]he Income Capitalization Approach has not been considered since the property is not income producing as investment real estate." His written report also included the statement: "The subject property is improved with a 15-story, plus penthouse, and four-floor tower, Class C office building built in 1913 more or less with a subsequent renovation completed by 1984 and was in average overall condition at the time of inspection for its age but in need of costly updates since the renovation was 20-plus years ago." Other portions of the report analyzed the property as if it were a regional mall or contained apartments. Murphy attributed discrepancies such as these to his mistaken failure to read "every word" and remove "boilerplate" language pertaining to other properties. In addition, contrary to his testimony, Murphy's written appraisal indicated that only the sales comparison approach was relevant and considered. Additional errors were that part of a chart used to illustrate CAP rate was about some other property, not 550 West Jackson, and a page included two different stabilized income figures, with one being for some other property.

¶ 25    On the second day of the hearing, the City called expert Dart to testify regarding her appraisal retrospective to January 1, 2009. The Dart appraisal was submitted by the municipality and adopted by the education board. Dart's qualifications as an appraiser included a business degree, a series of courses in real estate valuation, licensing in Illinois as a general real estate appraiser, and the MAI designation. In addition, Dart had nine years experience as a commercial valuations deputy assessor in the Cook County assessor's office and 20 years experience working for a commercial real estate appraisal firm or in her own firm, preparing commercial real estate valuations and reports regarding Chicago and Midwest properties.

¶ 26    Dart initially testified about her request to inspect the building, the lack of response from West Loop's counsel, and her need to rely on data in the Murphy appraisal and other documents.

1-15-1998, 1-15-1999, 1-15-2000, cons.

¶ 27    Dart considered the building to be a B+, although "+" and "-" classifications are not part of the industry's classifications for Chicago properties. The West Loop submarket had become a "premier office location" by January 2009, and the property itself was in highly desirable proximity to Union, Ogilvie, and La Salle Stations, as well as the expressway and available parking. Dart noted that the property's website described the building as Class A.

¶ 28    Dart developed sales comparison and income approaches but not a cost approach because estimating depreciation was difficult and "market participants" do not typically use the cost approach when considering investment properties. As part of her analysis, Dart looked at comparable land sales, and then estimated that the property's land-only value was $8.7 million. She also determined that its highest and best use was as an office building.

¶ 29    For her sales comparison calculations, Dart chose eight multitenant office buildings in the West Loop and Loop areas which sold between 2007 and 2009 for prices ranging between $152.48 and $393.08 per square foot. As detailed in her written appraisal, Dart adjusted the data based on sale date and other details such as a building's location, quality, size, condition, and age. It had been difficult to adjust for the value of leases at the comparable fee simple properties, but she believed that the adjustments for the location and physical characteristics nevertheless led to an understanding of the income-generating potential. She adjusted the sales prices from 2007 and 2008 downward to reflect that the market was no longer so favorable. Her written appraisal detailed the various adjustments. Dart also took into consideration the sale of the property in October 2005, for $308 per rentable square foot, and adjusted the price downward. Under the sales comparison approach, Dart valued 550 West Jackson at $75.1 million, which equated with $185 per rentable square foot. This value fell to the low end of the comparable sales range and was 40% below the sales price in October 2005.

1-15-1998, 1-15-1999, 1-15-2000, cons.

¶ 30    Dart did not consider her income approach analysis when developing her sales comparison approach, because the most reliable approach is to develop the figures separately and then reconcile the results by "weighting" the most reliable.

¶ 31    For the income approach, Dart considered the property's rent roll and operating statements, lease data from the property and 11 comparables, and research into the relevant rental market. Her analysis led her to apply a stabilized rental rate of $33.50 for the property per square foot, resulting in a total potential gross income of $13,602,374. She noted that $33.50 was on the lower end of the property's actual rents. To this she added $335,000 in garage and miscellaneous income and applied a 10% vacancy rate based on industry data. Her calculations yielded a total effective gross income of $12,850,000.

¶ 32    Next, Dart calculated operating expenses, by using data from the property, similar office buildings, and BOMA's expense listings for buildings in the downtown Chicago office market with 300,000 to 600,000 square feet. Dart calculated expenses to be $7.80 per rentable square foot or a total of $3,167,000. This expense ratio of 25.2% (before real estate taxes) was greater than the property's actual expense ratio for 2006, 2008, and 2009 of 20%, 23%, and 19%, but she estimated a leasing expense which was not included in the property's operating statements. She omitted 2007 because income had dropped when a tenant left the building. As far as she knew from looking at the data, the space had been relet within a year.

¶ 33    Dart did not include either tenant improvements or replacement reserves as operating expense items but instead used the expense categories that appeared in the property's historic statements, are "very common" in Chicago's central business district buildings, and are similar to BOMA's standards. She included tenant improvement expenses when she estimated market

1-15-1998, 1-15-1999, 1-15-2000, cons.

rent, and then, consistent with the building's historic statements and the practices of brokers and owners, she considered reserve expenses when she analyzed the CAP rate.

¶ 34    Deducting expenses from income led Dart to conclude that the property's net operating income was $9,415,000 or $23.19 per square foot. She developed three CAP rates, by looking at three comparable sales, "band of investment," and industry data. Because she made a lease deduction when estimating the property's net operating income, she did the same with the three comparables so that "we're comparing apples and apples." The three comparable sales had CAP rates of 4.4% to 8.3%, and the reported CAP rate when the subject property sold in 2005 was 5.75%. The band of investment showed a weighted average of 60% on the mortgage end and 40% on the equity end. Dart also researched industry data for the central business districts in Chicago and the nation. She "weighted" the Chicago market data which ranged between 9.1% and 9.5% in the first quarter of 2009. The national figures ranged from 7% up to 10% or 12%. She also considered the equity dividend rate, given that interest rates were low and the stock market "was fluctuating all over the place," which put downward pressure on investment returns at that time. She decided to use an equity dividend rate of 9.5% in her calculations. To gather the industry data, Dart looked at nationally recognized sources for the real estate industry and then focused on first tier and second tier investment properties. The average CAP rate for the nation was between 7% and 9% and the average in the Chicago market was 7.2-to-7.7%. Dart decided to use 9%, even though it was at the high end of the ranges, because the industry data did not include leasing. After developing an appropriate CAP rate, Dart determined an effective tax rate or load factor as 3.9%. Her loaded CAP rate was then 12.9%. Then she took her net operating income estimate of $9,415,000 and divided that by 12.9% to calculate a value by the income capitalization approach of $73 million.

1-15-1998, 1-15-1999, 1-15-2000, cons.

¶ 35    Dart reconciled the difference between her sales comparable and income approaches by giving more weight to her income approach, which is what real estate investors do when pricing a property like 550 West Jackson. Her expert opinion of the fair market value of the property as of January 1, 2009 was $73.8 million.

¶ 36    CBOE called Kevin A. Byrnes of Byrnes & Walsh, LLC, as a rebuttal witness. Byrnes did not develop his own opinion of the property's value. Byrnes was tasked with reviewing the Murphy report consistent with the Uniform Standards of Professional Appraisal Practice. Byrnes's expert qualifications included bachelor's and master's degrees, a series of courses and seminars in real estate appraisal, working as a residential sales agent prior to 1990 and as a commercial real estate appraiser subsequently, licensing as a general real estate appraiser in Illinois, Indiana, and Michigan, and earning the MAI designation from the Appraisal Institute. During his experience in Illinois dating to January 1994, Brynes had prepared approximately 1400 appraisals, including 1100 for commercial properties and 250 specifically for office buildings, and he had written about 700 appraisal review reports.

¶ 37    Byrnes's general opinion of the Murphy appraisal was that its value conclusions were not reasonably and adequately supported. Byrnes also noted that the Murphy appraisal contained several descriptive and typographical errors, which, taken together, caused Byrnes to question the report's accuracy. Byrnes's review led him to form seven main criticisms of Murphy's valuation. First, the appraiser mischaracterized the subject property as a Class B property, contrary to the building's details and its own marketing materials. Second, the report mischaracterized the building's location, in order to claim "locational obsolescence, ignoring nearly 7 million [square feet] of new office development in the subject's area west of the Chicago River." Third, the appraiser misapplied a depreciation analysis by using "a circular

- 19 -

1-15-1998, 1-15-1999, 1-15-2000, cons.

method of economic obsolescence that will always cause the cost approach [analysis] to equal the income approach [analysis]." This erroneous circular method led the appraiser to calculate 52.5% total accrued depreciation instead of the true 20%. Fourth, the appraiser estimated gross office rent based on activity in the building, which was valid, and on rental comparables in Class B buildings, which was not valid because the subject building was not fairly categorized within Class B. Fifth, the appraiser lacked factual support for the estimate of $9.19 per square foot in base operating expenses, this figure was at least $1.25 or 16% higher than the building's historical experience, and the appraiser compounded the misstatement by making deductions for reserves, leasing commissions, and tenant improvements which was contrary to prevailing practice in Chicago that those figures were "generally considered [to be] 'below the line' [(that is, below the net operating income line)] expenses." Also, the appraiser did not "adjust[ ] the CAP rate [(which this method would require)]." Sixth, the report lacked support for the "Capitalization rate analysis" conclusion of $9.75 "when its own comparable sales ranged from 5.38% to 7.75%." The seventh problem with the appraisal is that it purported to include a "Sales comparison analysis," but instead of actually applying the 15 comparable property sales that ranged from $149.99 to $401.78 per square foot, the appraiser used a value of only $142.50, which was a figure that Byrnes inferred had been created in the appraiser's own income approach analysis. Thus, the supposed sales comparison analysis was "a replica of the former, [and lacked the expected] independence." Byrnes spent 18 pages detailing his criticisms and concluded that the appraisal "neither appropriately nor credibly support[s] its value estimate of $58,000,000."

¶ 38    After the two-day hearing, PTAB concluded that appellant West Loop had failed to sustain its burden of proving the valuation of its property by a preponderance of the evidence,

1-15-1998, 1-15-1999, 1-15-2000, cons.

and that, conversely, the City had presented reliable evidence appropriately supported by data. Based on the credible evidence, PTAB determined that the 550 West Jackson property had a market value of $73.8 million. In other words, the assessment in effect was below value and an increase from $70.4 to $73.8 million was justified. West Loop then took this direct appeal.

¶ 39    West Loop first argues that by granting the City's motion *in limine*, PTAB committed an error that materially affected West Loop's rights and resulted in substantial injustice. West Loop contends it was entitled by procedural rule to 21 days to file its response to the motion *in limine*, that when the City "sprung" the motion on PTAB and West Loop just five days before the hearing, West Loop quickly completed its response as a courtesy to PTAB, but West Loop could not "thoughtfully respond" and give PTAB a thorough briefing of the factual and legal issues. West Loop also contends the motion itself was deficient, in that it did not describe reasonable, informal attempts to resolve the disagreement over Dart's access to the site before resorting to the formality of a motion *in limine*. West Loop argues it is impossible to know "how much of a pall" the *in limine* ruling "cast over the hearings" and that the circumstances warrant a reversal of the board's ruling and a new hearing.

¶ 40    Our review of the *in limine* ruling is deferential. An administrative agency has broad discretion in the conduct of its hearings. *John J. Moroney & Co. v. Illinois Property Tax Appeal Board*, 2013 IL App (1st) 120493, ¶ 50, 2 N.E.3d 522; *Wilson v. Department of Professional Regulation*; 344 Ill. App. 3d 897, 907, 801 N.E.2d 36, 43 (2003). An administrative agency's decision regarding the conduct of a hearing and the admission of evidence is subject to reversal only if there is "demonstrable prejudice" to the party complaining of the agency's ruling. *John J. Moroney*, 2013 IL App (1st) 120493, ¶ 50, 2 N.E.3d 522; *Crittenden v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112437, ¶ 59, 973 N.E.2d 408; *Wilson*, 344 Ill. App. 3d at 907,

1-15-1998, 1-15-1999, 1-15-2000, cons.

801 N.E.2d at 43. An administrative agency abuses its discretion only when "no reasonable person would take the position [it] adopted" or it has "act[ed] arbitrarily, fail[ed] to employ conscientious judgment, [or] ignore[d] recognized principles of law." *John J. Moroney*, 2013 IL App (1st) 120493, ¶ 50, 2 N.E.3d 522. Not every error warrants disturbing an administrative agency's ruling. Technical errors in the administrative proceeding or the agency's failure to observe the technical rules of evidence are not grounds for reversal of an administrative decision. 735 ILCS 5/3-111(b) (West 2010). Reversal is unwarranted "unless it appears to the court that such error or failure materially affected the rights of any party and resulted in substantial injustice to him or her." 735 ILCS 5/3-111(b) (West 2010). See also *McCleary v. Board of Fire & Police Commissioners*, 251 Ill. App. 3d 988, 993, 622 N.E.2d 1257, 1264 (1993) ("the appellate court may reverse an administrative ruling only if there is error which prejudiced a party in the proceeding"). Furthermore, PTAB has authority to interpret and apply its own rules, and a reviewing court will not interfere with an administrative agency's application of its rule unless "the interpretation is plainly erroneous or inconsistent with long-settled constructions." *Lake County Board of Review v. Property Tax Appeal Board*, 140 Ill. App. 3d 1042, 1051, 489 N.E.2d 446, 452 (1986).

¶ 41    The record indicates that on March 16, 2012, PTAB added the City to the proceeding as an intervenor and set a deadline of June 14, 2012, for the City to submit its evidence or request an extension. Dart then asked in a letter to West Loop's counsel that she receive access to and information about the property so that she could prepare the City's valuation. In her letter delivered to counsel on April 11, 2012, Dart expressly stated that due to time constraints, she was asking to visit the property and receive the information by April 27, 2012. This was a timeframe of slightly longer than two weeks. Dart submitted her appraisal about six weeks later,

1-15-1998, 1-15-1999, 1-15-2000, cons.

on June 13, 2012, and as of that date, West Loop had not responded to Dart's requests. Because West Loop did not respond to Dart, she noted in her report that she could make only "exterior and very limited interior observations of the property," that she was relying on the accuracy of certain data in the Murphy appraisal and from West Loop's counsel, and that she was reserving the right to revise her opinion.

¶ 42    These were the grounds the City set out in its subsequent motion, in which it cited section 1910.94(a). 86 Ill. Adm. Code 1910.94 (2006). The agency's procedural section provides:

> "a) No taxpayer *** shall present *** any testimony *** or other evidentiary material that is offered to refute, discredit or disprove evidence offered by an opposing party regarding the description, physical characteristics or condition of the subject property when the taxpayer *** denied a request made in writing by *** a taxing body, during the time when the Board was accepting documentary evidence, to physically inspect and examine the property for valuation purposes.
>
> b) Any motion made to invoke this Section shall incorporate a statement detailing the consultation and failed reasonable attempts to resolve differences over issues involving inspection with the taxpayer or property owner." 86 Ill. Adm. Code 1910.94 (2006).

¶ 43    We note that this procedural rule does not include a timeframe. West Loop's argument for reversal relies on a different rule, section 1910.64(d), which states that "[w]ithin 21 days after service of a motion, a party may file a response to the motion." 86 Ill. Adm. Code 1910.64(d) (2014). Based on this section, West Loop argues that any motion to PTAB must be filed no less than 21 days prior to a ruling on the motion, in order to provide a "minimum 21-day period to respond to the motion in writing."

1-15-1998, 1-15-1999, 1-15-2000, cons.

¶ 44    In our opinion, however, the fact that the section allows parties to file a response to a motion within 21 days does not mean that every motion must be filed with at least a 21-day lead time and it does not mean that PTAB cannot rule on a motion sooner where appropriate. Rather, section 1910.64(d) itself indicates the significance of the 21-day period is that a party that fails to file a response within that time "shall be presumed to have waived objection to the granting of the motion." 86 Ill. Adm. Code 1910.64(d) (2014).

¶ 45    Furthermore, PTAB, by granting the motion over West Loop's objection to its timeliness, plainly disagreed with West Loop's interpretation of section 1910.64(d). 86 Ill. Adm. Code 1910.64 (2014). As we indicated above, PTAB has authority to interpret and apply its own rules, and it is well-settled that a reviewing court will not interfere with the agency's application of its rules unless "the interpretation is plainly erroneous or inconsistent with long-settled constructions." *Lake County Board of Review*, 140 Ill. App. 3d at 1051, 489 N.E.2d at 452 ("[a] reviewing court should accord substantial discretion to administrative agencies in the construction and application of their rules, interfering only if the interpretation is plainly erroneous or inconsistent with long-settled constructions"); *Kankakee County Board of Review v. Property Tax Appeal Board*, 316 Ill. App. 3d 148, 154, 735 N.E.2d 1011, 1016 (2000) ("Although an agency's interpretation is not binding on the court, the court will give great weight to an agency's construction and application of its own regulation unless it is clearly erroneous, arbitrary, or unreasonable." (Internal quotation marks omitted.)). PTAB's interpretation of its rules to permit the City to file its motion *in limine* five days before the scheduled hearing cannot be characterized as plainly erroneous, nor can it be deemed arbitrary or unreasonable, and West Loop does not cite any authority indicating the filing was contrary to long-settled construction of the rule.

1-15-1998, 1-15-1999, 1-15-2000, cons.

¶ 46    In addition, West Loop overlooks the fact that the substance of the motion sought to prevent West Loop only from presenting evidence that disputed the City's "description, physical characteristics or condition of the subject property," because West Loop had failed to provide Dart an opportunity to inspect the property herself and that this evidentiary request was one that the City could have properly raised at any time during the hearing. The City, however, sought a resolution of this issue in advance of the hearing, which is, the purpose of a motion *in limine*. *Konieczny v. Kamin Builders, Inc.*, 304 Ill. App. 3d 131, 136, 709 N.E.2d 695, 699 (1999) (indicating a motion *in limine* is a motion prior to trial in which the movant seeks a ruling on the admissibility of evidence). The City could have first raised an objection when the evidentiary issue arose during the hearing. *Department of Public Works & Buildings v. Roehrig*, 45 Ill. App. 3d 189, 195, 359 N.E.2d 752, 758-59 (1976) (indicating that filing a motion *in limine* is never a necessary step for a party to preserve the right to object to evidence on the basis of ordinary evidential rules). Given that the City could have raised an evidentiary objection at any time during the hearing, it would serve no purpose for PTAB to impose a 21-day deadline for the City to raise the same issue prior to the hearing in a motion *in limine*.

¶ 47    Moreover, West Loop ignores that a different procedural rule, section 1910.90(f)(1), addresses written objections to the admissibility of evidence, and that section does not set a time frame. 86 Ill. Adm. Code 1910.90(f)(1) (West 2014). Section 1910.90(f)(1), states:

"f) Any party may object to the admissibility of evidence or testimony, and those objections must clearly state the specific ground or rule of law that is the basis for the objection.

1) When an objection is made to the admissibility of evidence prior to the hearing of the appeal, the objection must be made in writing. A copy of the objection shall be

- 25 -

transmitted to all other parties to the appeal, and the Property Tax Appeal Board shall solicit responses from all other parties. The Board shall issue its ruling on the objection in writing prior to the hearing of the appeal.

2) When an objection is made to the admissibility of evidence or testimony during the hearing, the Hearing Officer may either sustain or overrule the objection if it is based on the provisions of this Part, or may reserve the ruling and permit the testimony and/or evidence into the record subject to the ruling of the Property Tax Appeal Board on the objection in its decision for the appeal.

3) Any party offering evidence that is ruled inadmissible shall be permitted to make an offer of proof upon motion made at the hearing." 86 Ill. Adm. Code § 1910.90(f) (West 2014).

Thus, PTAB's procedural rules do not state a deadline for filing objections and expressly anticipate that objections may be made during the hearing. Given that the hearing was imminent in this case, the short time frame for the parties' arguments was reasonable and appropriate in this case.

¶ 48    We also note that West Loop did file a written response despite the short time frame, which PTAB fully considered before ruling on the motion. West Loop argues it should have been allowed more time to "thoughtfully respond" to the motion, but West Loop does not indicate how it would have responded differently if given more time. We would not be justified in disturbing PTAB's ruling on the City's motion on the basis of its timing, when West Loop does not even argue that earlier filing of the City's motion would have made any difference. Furthermore, for the most part, West Loop's written response protested that the City knew that Dart had not received access and so the City could have filed its motion earlier. By that same

1-15-1998, 1-15-1999, 1-15-2000, cons.

token, however, West Loop also knew that Dart had not received access and West Loop could have attempted prior to the "11th hour" to allow Dart to access the property.

¶ 49    Next, looking to section 1910.94's specific wording, West Loop contends that, strictly speaking, it did not "deny" access to Dart, it merely failed to respond to her inspection request. 86 Ill. Adm. Code 1910.94 (2006). West Loop contends that its failure was not an affirmative denial, it "was, at most, inadvertent" and West Loop points out that it sent an email to the City on March 20, 2015, offering Dart access. The email offer was made, however, only in response to the City's motion, years after the deadline that PTAB set for submitting evidence had passed. 86 Ill. Adm. Code 1910.60(d)-(f) (2014). We would not expect PTAB to regard West Loop's last minute offer as a substitute for giving a timely response to Dart's letter and allowing Dart a timely site visit. Rather, PTAB, exercising its discretion, reasonably regarded West Loop's failure to respond as the equivalent of a denial.

¶ 50    West Loop also contends that the motion was substantively deficient because it did not "incorporate a statement detailing the consultation and failed reasonable attempts to resolve differences over issues involving inspection with the taxpayer or property owner." 86 Ill. Adm. Code 1910.94(b) (West 2006). West Loop contends the City did not chronicle "failed reasonable attempts" and that this was reason for PTAB to deny the City's motion. West Loop, however, is incorrect. The motion did (1) describe and include as an exhibit Dart's written request to inspect the property, (2) include as an exhibit the certified mail receipt indicating the request had been delivered to and accepted by West Loop's counsel, and (3) observe that Dart's request had been "ignored." The motion, thus, did incorporate a statement detailing what failed efforts were made to obtain access. Therefore, the motion reasonably complied with the procedural rule. Despite West Loop's suggestion that the City had to detail repeated contacts and rebuffs, the rule does

1-15-1998, 1-15-1999, 1-15-2000, cons.

not include that standard. West Loop is attempting to shift responsibility for its own failure onto the City. West Loop's observation that PTAB encourages parties to use informal procedures first is not an indication that the City's motion was deficient or improper.

¶ 51    Assuming for the purposes of argument that PTAB erred in granting the motion *in limine* either due to its timing five days before the hearing or due to its content, reversal would still be unwarranted because West Loop has not shown "demonstrable prejudice to the complaining party" (*John J. Moroney*, 2013 IL App (1st) 120493, ¶ 50, 2 N.E.3d 522) or that the ruling materially affected the party's rights, causing substantial injustice (735 ILCS 5/3-111(b) (West 2010)). The ruling was very narrow and curtailed West Loop only from offering evidence intended to "refute, discredit, or disprove [the City's] evidence *** regarding the description, physical characteristics or condition of the subject property," because Dart was unable to form her own, direct opinion of those particular aspects of the property and had gathered the information from written materials provided by West Loop. Citing *Kankakee County Board of Review*, 316 Ill. App. 3d at 153, 735 N.E.2d at 1015, West Loop argues, "Given the impact that building characteristics could have had on the marketability of any real estate, but especially a multi-tenant office building in the West Loop area of Chicago, it is impossible [to tell] how much of a pall that granting the Motion *in Limine* cast over the hearings." West Loop, however, cites no instances in which its hearing presentation was meaningfully curtailed, and West Loop cites no instances in which its cross-examination of Dart was limited. Rather, West Loop's sole citation is to its closing argument. During West Loop's closing argument, an objection was sustained when counsel suggested that Dart should have been more sensitive to expenses purporting to arise from the "unique building characteristics." West Loop's counsel, however, quickly moved on and shifted his critique to other details of the Dart opinion and other evidence.

1-15-1998, 1-15-1999, 1-15-2000, cons.

Counsel returned to the topic briefly, arguing there were "unique characteristics and a unique location that must be taken into account," but no objection was made. The argument, objection, and ruling account for but a few sentences in the 10-page transcript of West Loop's closing argument. No particular importance can be attached to these brief moments during the hearing.

¶ 52    Moreover, the description, physical characteristics, and condition of the property were never in significant dispute. For instance, Murphy's report described the building essentially as follows:

> "The subject property is improved with an 18-story office building with a basement parking garage. This steel frame, metal, stone and glass office structure was rebuilt in 2001 utilizing the foundation and four-floor steel frame of the building that had previously occupied the site. That structure was approximately 38 years old ***. The structure was essentially rebuilt with a completion date of June 26, 2001. The reported gross building area is 485,162 square feet including two levels of basement area. *** The basement area houses the 148 parking stalls on both levels and mechanical equipment."

Similarly, Dart's report indicated:

> "The subject of this appraisal, known as 550 W. Jackson Boulevard, consists of a +/-7 year old, 18-story, multi-tenant office building containing an approximate gross building area of 485,162 square feet including two lower levels. According to the January 1, 2009 rent roll, the building has approximately 406,041 square feet of net rentable office area. The lower levels of the building consist of a 148 space parking garage as well as housing for the building's mechanical equipment."

Furthermore, Dart stated that she was accepting West Loop's information:

> "For purposes of this appraisal, building and site information, including descriptive

information, income and expense data and lease information has been obtained from the

appraisal performed by [O'Keefe and Murphy of] Urban Real Estate Research, Inc. and

data submitted by the subject property owner's legal counsel (Fisk, Kart, Katz, & Regan,

Ltd.). This information has been submitted to the Cook County Assessor, Cook County

Board of Review and/or Illinois Property Tax Appeal Board as part of an appeal of the

assessment placed against the subject property for *ad valorem* taxation by the Cook

County Assessor's Office."

¶ 53    In addition, the two appraisers' property classifications did not differ substantially. Murphy said the building was "a quality building," "a good building in a good location" and a "Class B building based on the lobby *** and based on the buildout." Similarly, Dart wrote in her report, "the subject represents a well-located, high quality office building, and competes well with other Class B+ buildings." Additionally, West Loop was able to question the building manager, Casey, about the property's characteristics and conditions, and elicited his testimony that the property should be classified as a B or B-, due to its location west of the river and its construction around the existing telephone room. On cross-examination, Casey acknowledged that the location in the West Loop office submarket was "the best" and that the building was conveniently located for commuters. Thus, the parties' classifications were nearly the same. Finally, and perhaps most importantly, PTAB's three decisions do not address any issues about the property's description, characteristics, or condition, and nothing in the decisions suggests that these matters played a significant part in the outcome of the tax appeals. The record does not support West Loop's argument for reversal of the *in limine* ruling.

¶ 54    West Loop has asserted that it is "impossible" to know "how much of a pall" PTAB's ruling on the motion *in limine* "cast over the hearings," but West Loop has not identified any

specific evidence necessary to its case and not otherwise already before PTAB, that was excluded by the *in limine* ruling. In fact, *Kankakee County Board of Review*, 316 Ill. App. 3d 148, 735 N.E.2d 1011, which West Loop cites to argue that prejudice can be shown when it is "impossible to tell the effect" of a ruling, demonstrates that a party complaining of evidentiary error must not only identify the evidence wrongly excluded but must also have preserved the error by making an offer of proof. In the cited case, a party asked to make an offer of proof, but the administrative law judge denied the request, which violated proper administrative procedure and deprived the party of the opportunity to preserve the omitted evidence for review. *Kankakee County Board of Review*, 316 Ill. App. 3d at 155, 735 N.E.2d at 1016. Here, however, West Loop never made an offer of proof and has not indicated what it would have done differently if the motion *in limine* ruling had not been in effect.

¶ 55    We have also taken into consideration that a motion *in limine* merely presents, in a pretrial setting, an issue of admissibility of evidence that is likely to arise at trial, and results in an interlocutory order. *Schuler v. Mid-Central Cardiology*, 313 Ill. App. 3d 326, 334, 729 N.E.2d 536, 543 (2000). Therefore, PTAB's ruling on the motion, like any other interlocutory ruling, remained subject to reconsideration by the agency throughout the hearing. *Schuler*, 313 Ill. App. 3d at 334, 729 N.E.2d at 543. See also *People v. Drum*, 321 Ill. App. 3d 1005, 1008, 748 N.E.2d 344, 347 (2001) (when the court does address a motion *in limine* on the merits, its ruling is always subject to reconsideration during trial; the court's final ruling takes place at trial, not before). However, the record indicates that the ruling did not play a significant part in the hearing and that PTAB was not given any reason to reconsider the ruling during the parties' presentations. Accordingly, in our opinion, West Loop's arguments about the *in limine* ruling are based on form rather than any substance in the parties' dispute.

1-15-1998, 1-15-1999, 1-15-2000, cons.

¶ 56    Based on this reasoning, we are unpersuaded that West Loop was prejudiced when PTAB granted the City's motion *in limine*, and we decline the invitation to disturb PTAB's judgment on the basis of this prehearing ruling.

¶ 57    West Loop's second main contention on appeal is that PTAB erred as a matter of law in giving Murphy's valuation methodology "no weight." Murphy's appraisal report discussed each of the three traditional approaches to real property valuation: replacement or cost approach, income approach, and sales comparison or market approach; however, Murphy believed only the income approach was appropriate for the subject property. West Loop claims its argument presents a question of law regarding the proper method of valuation, and, therefore, justifies nondeferential, *de novo* review.

¶ 58    The record discloses, however, that PTAB did not require, as a matter of law, the use of three methodologies over a single methodology but, instead, considered Murphy's reasoning and found it unpersuasive. PTAB came to the conclusion that Murphy's opinion was "self-validating and contradictory to accepted appraisal practice." PTAB's opinion was based on factual rather than legal issues. PTAB also noted that Byrnes "had credibly testified as to the flaws within the [Murphy] appraisal." PTAB proceeded to weigh Dart's opinion. After assessing the credibility of *all* the evidence presented, PTAB decided to "give *most* weight to the [Dart] appraisal." (Emphasis added.) This weighing of the evidence, which included Murphy and Dart's data and opinions, led PTAB to reject West Loop's proposed $58 million valuation based on Murphy's unreliable appraisal and accept Dart's reliable estimation of the property's value to be $73.8 million. When read in context, PTAB's decision was based on fact issues and witness credibility, not on a preference for a specific valuation methodology, and certainly not on legal issues. West Loop simply disagrees with PTAB's opinion of the manifest weight of the evidence.

1-15-1998, 1-15-1999, 1-15-2000, cons.

Accordingly, West Loop's second main contention on appeal is fairly addressed with its third main contention, which is that PTAB's decisions to increase the subject property's assessed value for 2009, 2010, and 2011 were against the manifest weight of the evidence.

¶ 59    On review, the agency's factual determinations are deemed *prima facie* true and correct. *Residential Real Estate Co. v. Illinois Property Tax Appeal Board*, 188 Ill. App. 3d 232, 241-42, 543 N.E.2d 1358, 1363-64 (1989). Therefore, a finding of fact, such as a finding regarding a property's fair market value, will not be disturbed unless it is against the manifest weight of the evidence (*Residential Real Estate Co.*, 188 Ill. App. 3d at 241-42, 543 N.E.2d at 1363-64), which occurs only "when all reasonable and unbiased persons would agree that the opposite conclusion is clearly evident." *National City Bank of Michigan/Illinois v. Property Tax Appeal Board*, 331 Ill. App. 3d 1038, 1042, 780 N.E.2d 691, 695 (2002). See also *Kraft Foods, Inc. v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 121031, ¶ 51, 997 N.E.2d 835. In addition, "weighing evidence and determining the credibility of witnesses are jobs of *** PTAB and are uniquely in its province." *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 51, 997 N.E.2d 835. On administrative review, we do not reweigh the evidence, reassess the credibility of witnesses, make independent determinations of the facts, or substitute our judgment for PTAB's. *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 51, 997 N.E.2d 835. We will not disturb PTAB's judgment merely because there was a difference of opinion as to the property's valuation. *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 51, 997 N.E.2d 835. Our role is only to ensure that an objective, rational decision was reached after a fair hearing at which competent evidence was introduced. *Residential Real Estate Co*, 188 Ill. App. 3d at 241, 543 N.E.2d at 1363-64.

¶ 60    West Loop contends that PTAB's erroneous determination that the three traditional approaches to valuation must be independent of one another then influenced PTAB's findings of

fact. The only challenge West Loop makes to PTAB's factual findings is that the agency cited no source for its finding that Murphy "made many illogical and unsupported statements throughout the hearing about adjustments made by the assessor's office and the board of review as reasoning for why he used the income approach to make adjustments to the sales comparison approach."

¶ 61    However, PTAB's three decisions include a detailed recitation and analysis of the evidence that was presented by the petitioner, respondent, and intervenors. As for West Loop's evidence, PTAB found the Murphy appraisal was "flawed in that both the sales comparison approach and the cost approach to value rely on the income approach to value in developing an estimate of value under those approaches." PTAB noted that "proper appraisal methodology requires that each approach to value be independent of each other and then reconciled among the approaches to estimate a final conclusion of value for a property." PTAB stated that Murphy had, however, "readily admitted" to using his income approach to adjust both his sales comparison and cost approaches. West Loop suggests that one of the roles of an appraiser is to reconcile disparate data to reach a final determination of value. However, PTAB found that Murphy's methodology was "contradictory to accepted appraisal practice." West Loop suggests that when the administrative law judge (PTAB) asked Murphy to explain his rationale, she indicated that she understood what he was describing. The report of proceedings, however, does not indicate to this court that the administrative law judge agreed in any way with Murphy's reasoning, only that Murphy had sufficiently clarified his answer. Her acknowledgment of his clarification is not reason to overturn PTAB's judgment. In addition to indicating that Murphy's methodology was self-serving and an unsound approach, PTAB noted Murphy had made "many illogical and unsupported statements throughout the hearing" about valuation adjustments purportedly made by the assessor and the board of review. Consequently, PTAB found that it could give no weight

1-15-1998, 1-15-1999, 1-15-2000, cons.

to Murphy's sales comparison and cost approaches. Furthermore, although not specifically noted in PTAB's decisions, we point out that Murphy's testimony and appraisal were confusing and required follow up questions from counsel, as well as clarifying questions by the administrative law judge, and that the Murphy appraisal contained multiple mistakes.

¶ 62    PTAB then evaluated Murphy's income approach. Among other factual findings, PTAB found that Murphy's calculations deflated 550 West Jackson's income while inflating expenses, resulting in a lower net operating income. Murphy's calculations were "at the high end or above the range of the subject's actual expenses, the most similar comparables, or the most comparable market surveys." Murphy then further lowered the net operating income when he "added tenant improvements and leasing commissions as above-the-line expenses when market surveys indicate these items are not typically taken as above-the-line expenses in the Chicago market." PTAB found Murphy "then used this as an excuse for the flaws in [his] market extraction method for developing the CAP rate." Because other properties did not make these deductions above-the-line as Murphy did, he was unable to derive overall CAP rates using this method. PTAB also noted that the Murphy had "incorrectly used Tier III properties to justify a higher CAP rate when the subject [property] is a Tier II, or Class B building."

¶ 63    Next, PTAB determined that appraiser Dart, in contrast to appraiser Murphy, had "credibly performed each approach to value independently and then reconciled these approaches to estimate a final conclusion of value for the subject." PTAB also found Dart's analyses were reliably performed and appropriately supported with market data. In discussing the cost approach, Dart had "clearly explain[ed] the unreliability of developing a depreciation rate with the limited data provided." For her sales comparison approach, Dart reviewed similar properties, adjusted the data based on pertinent factors, and "clearly and credibly" explained her

1-15-1998, 1-15-1999, 1-15-2000, cons.

adjustments. PTAB further found that for her income approach, Dart had developed a CAP rate "supported by credible market data from all three methods: market extraction, band of investment, and market surveys." In addition, Dart properly accounted for replacement reserves by adjusting her CAP rate calculations. Dart also "credibly testified" that to account for expenditures on tenant improvements, she had adjusted her calculations for the subject property's market rent.

¶ 64    In addition to these findings about Murphy and Dart's conclusions, PTAB determined that expert Byrnes (the rebuttal witness) "credibly testified as to the flaws within the [Murphy] appraisal." Furthermore, Byrnes's "testimony addressing the methodology and the data used bolster[ed] the [Dart] appraisal."

¶ 65    Based on its review of the evidence presented, PTAB decided to give "most weight to the intervenors' appraisal and find[ ] that the subject [property] has a market value of $73,800,000," which reflected the value that Dart had reached. Because the challenged assessment reflected a lesser market value (by several million), PTAB determined that "an increase [in the assessment] is justified."

¶ 66    Thus, West Loop and the intervenors supplied evidence of differing values, and PTAB found the intervenors' evidence more persuasive. We will not disturb PTAB's findings "where there exists simply a difference of opinion regarding the actual value of the property." *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 51, 997 N.E.2d 835. In particular, the Dart valuation included an income approach calculated differently from the Murphy appraisal, as well as a sales comparison approach that clearly identified her adjustments. PTAB also had the benefit of Byrnes's review indicating that Murphy's value conclusions were unreliable and inadequately supported. PTAB found the Dart opinion credible, reliable, and appropriately supported and so

1-15-1998, 1-15-1999, 1-15-2000, cons.

gave greater weight to it than the Murphy opinion. PTAB determined, among other things, that Murphy's income approach included inflated expense deductions, took further deductions that were not typical for the Chicago market, and used a less well-supported CAP rate than Dart's analysis. In light of this conflicting evidence, West Loop has not met its burden on appeal of showing that "all reasonable and unbiased persons would agree that the decision[s] [are] erroneous and that an opposite conclusion [in favor of the Murphy appraisal] is clearly evident." (Internal quotation marks omitted.) *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 51, 997 N.E.2d 835; *National City Bank of Michigan/Illinois*, 331 Ill. App. 3d at 1042, 780 N.E.2d at 695. PTAB's decisions are not against the manifest weight of the evidence and will not be disturbed on appeal.

¶ 67    For these reasons, we affirm PTAB's final administrative decisions.

¶ 68    Affirmed.